**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**EVANSVILLE DIVISION**

| | |
|---|---|
| Ashley W. and Betty W., minors, by Next Friend Denise DURNELL; Thomas M. and Milo S., minors, by Next Friend Robin HERBERT; Jaidyn R. and James M., minors, by Next Friend Gabrielle HULL; Logan S., a minor, by Next Friend Gloria COYLE; Sara O., a minor, by Next Friend Holly CARROW; Desmond C., a minor, by Next Friend Alan FOREMAN; individually and on behalf of all children who are, or will be, in the custody of the Indiana Department of Child Services, | Case No. 3:19-cv-129 |
| Plaintiffs, | |
| v. | CLASS ACTION COMPLAINT |
| Eric HOLCOMB, in his official capacity as the Governor of Indiana; Terry STIGDON, in her official capacity as the Director of the Indiana Department of Child Services; and the INDIANA DEPARTMENT OF CHILD SERVICES, | |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

1.      On December 12, 2017, the Director of Indiana's Department of Child Services ("DCS"), Mary Beth Bonaventura, submitted her letter of resignation to Defendant Governor Eric Holcomb, warning that Indiana officials were systematically placing Hoosier children at risk "in ways that all but ensure children will die." Today, Indiana's child welfare system continues to fail to protect children, and, in many instances, inflicts further trauma upon an already vulnerable population.

2.      Indiana has long assumed responsibility for children who have been abused or neglected by their parents or caregivers. Yet the system Indiana has created to protect these children, administered through its Department of Children's Services ("DCS"), instead often causes them further trauma.

3.      Indiana removes children from their homes and places them into foster care at a staggering rate—more than double the national rate. While children are in DCS custody, Indiana fails to keep them safe, often placing them in inappropriate, unstable, or overly restrictive placements; fails to provide necessary support services and medical and mental health care; and fails to provide meaningful case management. Many of these children unnecessarily languish in foster care for years before they are reunified with their primary caretakers, are adopted, or age out of the system. The delays caused by DCS inflict further emotional trauma.

4.      The shortcomings of the Indiana foster care system are well known by state officials, who have received numerous reports documenting its disarray over the past five years. The most recent of these reports is an extensive expert analysis by the well-respected Child Welfare Consulting Group ("CWG"). The state's systemic and continued failure to correct these issues leaves children in serious and unconstitutional danger.

5.      Although the state has made some changes to the foster care system since the issuance of the CWG report, the changes are minimal, and the basic problems continue. The agency appears to be focused more on statistics than outcomes, by allegedly not investigating cases or closing cases that are not yet ripe for closing and without providing necessary services to children. Moreover, the state has not taken necessary steps to address the shortage of appropriate placements for children, particularly those who remain in inappropriate and sometimes abusive institutional settings for long periods of time.

6.     The named Plaintiffs[1]—Sara, Logan, Ashley and Betty of Marion County, Jaidyn and James of Allen County, Thomas and Milo of Spencer County, and Desmond of Wells County—are children in foster care in Indiana. They bring this lawsuit as a civil rights action on behalf of all children who are now, or will be, in the custody of DCS. For each named plaintiff, DCS has failed to provide safe and appropriate foster care placements; failed to provide appropriate services to the children and their families to allow safe reunification; and, for those for whom safe family reunification is not possible, failed to timely pursue termination of parental rights legal proceedings and failed to seek and secure safe, permanent homes.  In doing so, Defendants have violated Plaintiffs' federal constitutional and statutory rights.

7.     Plaintiffs seek declaratory and injunctive relief against the Defendants—the state agency and state officials responsible for operating Indiana's foster care system—for violating Plaintiffs' rights under the U.S. Constitution and federal laws, which promise vulnerable children for whom the State has assumed responsibility the right to be free from physical and psychological harm. The subclass of children with disabilities who are currently residing in institutional settings are further entitled to be free from discrimination based on their disabilities under the Americans with Disabilities Act ("ADA").

8.     Director Bonaventura's resignation prompted Governor Holcomb to commission an evaluation of DCS. On June 18, 2018, the CWG released its Evaluation of the Indiana Department of Child Services ("the CWG Report"), which identified a number of challenges facing Indiana's child welfare system, including, but not limited to, Indiana's:

      a.     Extremely high rate of children in out-of-home care compared to the rest of the nation;

---

[1] The named Plaintiff children and any other minors mentioned by name in this Complaint all appear by pseudonyms with the same first and last initials as their real names.

b.      High caseloads amongst DCS Family Case Managers ("FCMs") and agency attorneys;

c.      High rates of FCM and DCS attorney turnover, as well as a "culture of fear" within DCS;

d.      Highly centralized management and approval processes that lead to delayed service delivery for children and their families;

e.      Uneven interpretation and implementation of policies across counties; and

f.      DCS's failure to meet the federal standard for instances of repeat maltreatment.

9.      Notably, the CWG Report revealed that there have been at least five other DCS evaluations prepared by external evaluators since 2013. Those prior reports highlight many of the same systemic issues afflicting Indiana's child welfare system today. Despite the fact that these issues have been called to the attention of officials before, they persist.  Moreover, the recent changes announced by the Governor are not fundamental and do not address the systemic issues raised by the CWG Report.   Indeed, many of the statements issued by DCS in its periodic progress reports, the most recent of which was issued on June 14, 2019, either involve DCS having more meetings with state officials or creating processes that enable DCS to deny responsibility for many of the problems.

10.     The problems with Indiana's child welfare system run even deeper than those covered by the CWG Report. DCS lacks sufficient foster placements for youth alleged to be Children in Need of Services ("CHINS"), leaving children for extended periods of time in emergency shelter care or forcing children to sleep in DCS offices; fails to engage in appropriate placement matching, subjecting children to multiple and inappropriate foster care placements;

regularly separates sibling groups; and fails to provide children with disabilities with adequate support services to meet their medical,  psychological, or developmental needs in the most appropriate, least restrictive environment.

11.     Additionally, when children cannot be safely reunified with their parents, DCS fails to develop a realistic alternative permanency plan, often filing multiple unsuccessful termination of parental rights petitions. In instances where children are legally freed for adoption, DCS has failed to seek and secure appropriate adoptive homes in a timely manner, essentially rendering these children legal orphans.

12.     DCS has also failed to provide appropriate integrated community-based services, programs, or activities to children with disabilities who are wards of DCS, consistent with their individual needs. Instead, DCS routinely places these children in overly restrictive residential or institutional settings. For many children with disabilities, their involvement in the child welfare system places them at a greater risk of institutionalization.

13.     Plaintiffs seek a ruling from this Court that the structural deficiencies and long-standing actions and inactions of the Defendants described in this Complaint violate the statutory and constitutional rights of all children dependent on the Indiana child welfare system for their safety, well-being, and futures. Plaintiffs seek declaratory and injunctive relief against DCS and state officials named as Defendants in this lawsuit, directing that necessary and appropriate relief be granted so that Indiana's children are no longer irreparably harmed by the system that that has failed its mandate to protect them. Plaintiffs ask this Court to protect their right to a safe and nurturing childhood.

## PARTIES

### A.     The Named Plaintiff Children.

#### 1.     Ashley W. and Betty W.

14.     Plaintiffs Ashley W. and Betty W. are respectively four and five-year-old sisters who have been in court-ordered out-of-home placement under the custody of DCS for over two-and-a-half years. Upon information and belief, Ashley and Betty currently reside in non-kinship foster homes in Delaware County. Ashley and Betty are members of the General Class.

15.     Ashley and Betty appear in this action through their next friend, Denise Durnell. Ms. Durnell is the Vice President of the Foster Parent Association of Allen County, an organization with approximately 200 members. Ms. Durnell has been a licensed foster parent for nine years in Indiana and has adopted three children out of the foster care system. As a child, Ms. Durnell and her siblings were placed in out-of-home foster care. Ms. Durnell has acquainted herself with the allegations in the Complaint regarding Ashley and Betty's experience in foster care and is dedicated to their best interests.

#### 2.     Milo S. and Thomas M.

16.     Milo S. and Thomas M. are brothers. Milo is three years old and Thomas is five years old. Milo and Thomas have been in court-ordered out-of-home placement under the custody of DCS for nearly three and four years, respectively. Milo and Thomas currently reside in a non-kinship foster home in Vanderburgh County. Milo and Thomas are members of the General Class. Milo and Thomas's underlying CHINS case was filed in this District.

17.     The boys appear in this action through their next friend, Robin Herbert. Ms. Herbert is a friend of the boys' foster parents and has known them since Milo was three months old and

Thomas was two years old. Milo and Thomas refer to Ms. Herbert as "Aunt Rob." Ms. Herbert visits the boys weekly and has babysat for them. Ms. Herbert is dedicated to their best interests.

### 3.   Jaidyn R. and James M.

18.    Jaidyn R. and James M. are  brothers. Jaidyn is four years old and James is three years old.  The two boys are currently in court-ordered out-of-home placement in a non-kinship foster home in Allen County. The boys have been in the custody of DCS since December 12, 2016. Jaidyn and James are members of the General Class.

19.    Jaidyn and James appear in this action through their next friend, Gabrielle Hull. Ms. Hull has been a Court Appointed Special Advocate ("CASA") volunteer since 2017, and through this position has advocated for children who are involved with Indiana's child welfare system. As a child, Ms. Hull was in foster care in Indiana for nearly two years. Ms. Hull is an animal control officer in Fort Wayne, Indiana, holding a special police commission that permits her to investigate criminal behavior involving animals. As an animal control officer, Ms. Hull occasionally works alongside DCS. Ms. Hull has babysat for Jaidyn and James on numerous occasions and is dedicated to their best interests.

### 4.   Logan S.

20.    Logan S. is a 12-year-old boy who entered Indiana's foster care system and became a ward of DCS over 10 years ago. Logan currently resides in a private secure facility in Lake County. Logan is a member of the General Class and ADA Subclass.

21.    Logan appears in this action through his next friend, Gloria Coyle. Ms. Coyle became a licensed foster parent in Ohio in 1994. She moved to Indiana in 2011 and within a few years became a licensed therapeutic foster parent. Upon information and belief, Ms. Coyle fostered

Logan for between one and two years and still maintains contact with him. Ms. Coyle is dedicated to Logan's best interests.

        5.    <u>Sara O.</u>

22.    Sara O. is 14 years old. She first entered foster care in Indiana when she was seven years old. Sara currently resides in a private secure facility in Lake County. Sara is a member of the General Class and ADA Subclass.

23.    Sara appears in this action through her next friend, Holly Carrow. Ms. Carrow was a licensed foster parent in Indiana from approximately 2011 until 2016. During that time, she fostered approximately 15 to 20 youth. Upon information and belief, Ms. Carrow was an emergency foster placement for Sara O. for a few weeks in 2015. Ms. Carrow is dedicated to Sara's best interests.

        6.    <u>Desmond C.</u>

24.    Desmond has been in court-ordered out-of-home placement under the custody of DCS for seven years. Desmond is 16 years old and currently placed in an adult, long-term care nursing home facility, located in Lawrence County. Desmond is a member of the General Class and ADA Subclass.

25.    Desmond appears in this action through his next friend, Alan Foreman. Mr. Foreman is a therapeutic foster parent and has been a foster parent in Indiana for 25 years. He has fostered over 100 children. Desmond lived with Mr. Foreman for approximately four-and-a-half years. Mr. Foreman is dedicated to Desmond's best interests.

**B.    Defendants.**

26.    Eric Holcomb, Governor of Indiana, is sued in his official capacity. Under Article 5, Sections 1 and 16 of the Indiana Constitution, the Governor holds executive power of the state

and is responsible for executing Indiana's laws and ensuring executive departments comply with all applicable laws. Governor Holcomb has the power to issue executive orders and to shape the functions and coordination of DCS. Governor Holcomb is charged with appointing the Director of DCS, who serves "at the pleasure of the Governor" and reports "directly to the Governor." IN Exec. Order No. 05-15 (Jan. 11, 2005); IND. CODE § 31-25-1(b) (2019). The Governor has used his executive authorities to manage the work of DCS, and, as such, child welfare in Indiana.

27.     DCS serves as the executive agency responsible for the safety and well-being of children in Indiana. DCS is the agency with overall non-delegable custodial responsibility for investigating allegations of child abuse and neglect, placing children in appropriate and safe foster care placements, ensuring children's safety and well-being, and guaranteeing that children in foster care receive appropriate services, mental health screening, and treatment. DCS also regulates and licenses Indiana's child caring institutions, foster homes, group homes, and child placing agencies. DCS has offices throughout the state, including in this District.

28.     Terry Stigdon, Director of DCS, is sued in her official capacity. Director Stigdon is "responsible for administering" DCS. IND. CODE § 31-25-1(b) (2019). She employs personnel to carry out DCS's responsibilities and must organize DCS in a manner best suited for providing its necessary services and carrying out its functions throughout the state. Director Stigdon is ultimately responsible for ensuring DCS finds suitable homes for children in need of care, keeps them safe while in DCS custody, properly supervises children, and provides them and their families with necessary services.

## JURISDICTION AND VENUE

29.     This action for injunctive relief pursuant to 42 U.S.C. § 1983 is based upon the continuing violations of Plaintiffs' rights under the First, Ninth and Fourteenth Amendments of

the United States Constitution, the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and the respective implementing regulations.

30.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

31.     This Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

32.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred in this District, and Defendants maintain offices and conduct business in this District. In addition, two of the named Plaintiffs' CHINS cases were filed in this District.

## CLASS ACTION ALLEGATIONS

**A.     FACTUAL ALLEGATIONS REGARDING SYSTEMIC DEFICIENCIES PLAGUING INDIANA'S FOSTER CARE SYSTEM AND RESULTING HARM TO PLAINTIFF CHILDREN.**

33.     This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

34.     This action consists of one general class and one subclass:

  a.     A class comprised of all children for whom Indiana DCS has or will ever have legal responsibility and/or a special relationship in the context of the child protection system (the "General Class"); and

  b.     A subclass comprised of all members of the General Class who have or will have emotional, psychological, cognitive, or physical disabilities (the "ADA Subclass").

35.     Each class is sufficiently numerous to make joinder impracticable. The General Class consists of at least 22,000 children who are in the legal and/or physical custody of DCS and/or with whom DCS has a special relationship. Over 14,300 of these children are in out-of-home care.

36.     The ADA Subclass consists of thousands of children with disabilities who are or will become a ward of DCS and who, because of a disability, are at a higher risk of being placed in overly-restrictive, institutional settings or are currently placed in overly restrictive institutional settings.

37.     The questions of fact and law raised by named Plaintiffs are common and typical of each putative member of the classes whom they seek to represent.

38.     The named Plaintiffs rely on Defendants for foster care services in Indiana and wholly depend on Defendants for provisions of those services.

39.     Defendants' long-standing and well-documented actions and inactions substantially depart from accepted professional judgment and constitute deliberate indifference to the harm, risk of harm, and violations of legal rights suffered by the named Plaintiffs and the classes they represent.

40.     Questions of fact common to the classes include:

    a.      whether Defendants fail to protect the General Class from physical, psychological, and emotional harm;

    b.      whether Defendants fail to make sufficient efforts to place members of the General Class in appropriate permanent homes within a reasonable period of time;

c.      whether Defendants fail to provide foster care placements and individualized services that ensure members of the General Class's well-being;

d.      whether Defendants provide adequate case worker resources to ensure that members of the General Class can routinely and meaningfully meet with caseworkers face-to-face and engage in individual services;

e.      whether Defendants operate a system that provides an adequate diversity of placements to permit the members of the General Class and ADA Subclass to reside in the most integrated, least restrictive, and most family-like environment;

f.      whether Defendants fail to take reasonable steps to make it such that members of the General Class do not experience failed trial home visits; and

g.      whether Defendants deprive Plaintiffs of the ADA Subclass necessary and appropriate services and treatment to ensure access to a stable, family-like foster placement in the least restrictive environments.

h.      whether Defendants failed to provide appropriate, integrated community-based services, programs, or activities to the Plaintiffs of the ADA Subclass in order to support their needs in the community and prevent unnecessary and prolonged institutionalization.

i.      whether Defendants have placed an over-reliance on institutional settings for Plaintiffs of the ADA Subclass and have failed to provide meaningful

case management services or create a realistic permanency plan that does not include institutionalization.

j. whether Defendants have violated the rights of the plaintiffs within the ADA Subclass by administering the State's foster care system in a manner that denies qualified children with disabilities the benefits of the State's services, programs, or activities in the most integrated setting appropriate to their needs, and by failing to reasonably modify the State's foster care system to avoid discrimination against children with disabilities.

41. Questions of law common to the classes include:

a. whether Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

b. whether Defendants' systemic failures violate Plaintiffs' right to a permanent home and family, as well as their right to be free from harm and have their basic needs met under the First, Ninth, and Fourteenth Amendments to the U.S. Constitution;

c. whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997;

d. whether Defendants' systemic failures violate Plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and the respective implementing regulations; by unnecessarily placing youth with disabilities,

or placing them at risk thereof, in institutional settings and denying them access to meaningful, individualized, and appropriate community-based treatment and supports.

42.     The violations of law and resulting harms averred by Plaintiffs are typical of the legal violations and harms and/or risk of harms experienced by all of the children in the classes.

43.     The named Plaintiffs will fairly and adequately protect the interests of the classes that they seek to represent. Defendants have acted or failed to act on grounds generally applicable to all members of the classes, necessitating class-wide declaratory and injunctive relief. Counsel for Plaintiffs know of no conflict among the class members.

44.     The named Plaintiffs and Plaintiff Children are represented by the following attorneys, who are competent and experienced in class action litigation, child welfare litigation, and complex litigation:

a.      Marcia Robinson Lowry, an attorney with A Better Childhood, Inc., a non-profit legal advocacy organization, who has extensive experience and expertise in federal child welfare class actions throughout the U.S.;

b.      Melissa Keyes, Thomas Crishon, and Nikki Gray, attorneys with Indiana Disability Rights, which is the service arm of the Indiana Protection and Advocacy Services Commission, who have extensive experience and expertise representing individuals with disabilities; and

c.      Aaron Marks, Carrie Bodner, Kara Cheever, and Kristen Bokhan, attorneys with Kirkland & Ellis LLP, which has extensive experience and expertise in federal class actions throughout the U.S.

## BACKGROUND

I.   **OVERVIEW OF DCS AND FEDERAL AND CONSTITUTIONAL REQUIREMENTS.**

   A.   **The Role of DCS.**

45.   DCS is the Indiana state agency responsible for the safety and well-being of all Hoosier children who come into contact with the state's child welfare system.  DCS has a central office in Indianapolis and 18 regional offices that cover Indiana's 92 counties.

46.   DCS's mandate is twofold:  it is charged with overseeing the protection of Hoosier children and with child support enforcement.  DCS is the primary state agency responsible for receiving and assessing reports of alleged child abuse and neglect.  Under Indiana law, DCS's responsibilities include, but are not limited to, providing child protection services; providing child abuse and neglect prevention services; providing family preservation services; regulating, licensing, and monitoring foster family homes, licensed child placing agencies, child caring institutions, group homes, and private secure facilities; administering foster care services; and conducting adoption and guardianship services.

47.   DCS has created child welfare policies and practice standards in order to carry out its responsibilities and comply with legal requirements under state and federal law.

48.   The Director of DCS employs personnel to carry out DCS's mandate, including but not limited to family case managers ("FCMs"), who are responsible for investigating allegations of abuse and neglect as well as planning for children in foster care. The Director is also responsible for monitoring and supervising the services associated with ongoing child in need of services ("CHINS") cases.

49.   Limits on FCM caseloads are intended to help ensure that each child and family receives sufficient attention and prevents burnout among FCMs.  By statute, FCM caseloads are

to be capped at 12 families who are receiving in-home services and 13 children who are in out-of-home placements, a provision which was passed by this session of the legislature and went into effect on June 13, 2019. However, defendants did not meet the caseload limits set previously, when the caseloads were capped at 12 cases for assessment of reports of abuse and/or neglect and 17 for ongoing cases.

50.     DCS also contracts with numerous service providers throughout Indiana to deliver services related to the prevention of abuse and neglect, preservation of families, placement of children, and permanency goals for children who enter foster care.

**B.     Overview of Federal Law.**

51.     The U.S. Constitution and federal statutes impose affirmative obligations on all state and child welfare officials, including Defendants and others employed by DCS.

52.     For instance, the Due Process Clause of the U.S. Constitution requires that all state and local child welfare officials ensure that each child placed in foster care: is free from the foreseeable risk of physical, psychological, and emotional harm; receives the services necessary for his or her physical, psychological, and emotional well-being; is provided with conditions, treatment, and care consistent with the purpose and assumption of custody; is not maintained in custody longer than is necessary to accomplish the purpose of custody; and is provided with an appropriate permanent home and family within a reasonable period of time.

53.     Similarly, federal law requires that state child welfare officials place each child in foster care in a foster placement that conforms to nationally recommended professional standards, and provide each child quality services to protect his or her safety and health. *See* 42 U.S.C. §§ 671(a)(10),(22). Officials must also provide an individualized, written case plan that seeks to provide safe, appropriate, and stable foster care placements or, when reunification with the child's

parents is not possible or appropriate, a written case plan that ensures the identification of an appropriate adoptive or other permanent home for the child. *See* 42 U.S.C. §§ 671(a)(16); 675(1)(A),(E). Written case plans must also ensure the child's educational stability. *See* 42 U.S.C. §§ 671(a)(16), 675(1)(G).

54.     Federal law also regulates child welfare officials' case review systems, and requires that these officials maintain a case review system in which: each child in foster care has a case plan designed to achieve safe, appropriate, and stable foster care placements; the status of each child in foster care is reviewed at least every six months by a court or person responsible for case management for purposes of determining the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan, and the projected date of permanency; and, for each child who has been in foster care for 15 of the most recent 22 months, the responsible child welfare agency files a petition to terminate the parental rights of the child's parents and concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child. *See*  42 U.S.C. §§ 671(a)(16); 675(5)(A)-(C),(E).

55.     Title II of the ADA prohibits the unjustified segregation of persons with disabilities, *see* 42 U.S.C. § 12132; *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999), and requires that state agencies, such as Defendants, "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

56.     Defendants have and continue to violate each of the aforementioned federal rights of the named Plaintiffs and other Hoosier children in the affected Class.

## II.     THE NAMED PLAINTIFFS.

57.     DCS's failings are readily apparent in the case of the named Plaintiffs, all of whom have suffered significant harm under Defendants' watch.

### A.     Ashley W. and Betty W.

58.     Ashley W. and Betty W. are sisters. Ashley is four years old and Betty is five years old. Ashley and Betty have been in court-ordered out-of-home placement under the custody of DCS for over two-and-a-half years. Prior to entering foster care, they were living with their mother and stepfather.

59.     Ashley and Betty's father is not a respondent in the CHINS action.

60.     Ashley and Betty first came to the attention of DCS in July 2016. DCS received a report that Ashley (then age one) and Betty (then age two) were being sexually abused by their stepfather. The report indicated that the girls would hide when their stepfather came home. Betty was observed fondling herself in her diaper and later said she touched her vaginal area because that is what her stepfather does. DCS also received reports that Ashley had soreness and tears in her vaginal area. Ashley repeatedly pointed at her vaginal area and said "owie."

61.     Upon receiving the reports, DCS opened the case for an investigation, but did not remove the children from the home.

62.     A few weeks later, upon information and belief, while DCS's investigation was ongoing, DCS received another report that the girls' mother, stepfather, and other adults were abusing methamphetamine in the home. At some point, DCS received additional reports that the stepfather kept a gun in the home, punched walls, and was threatening to blow the house up.

63.     Upon information and belief, despite receiving credible reports of sexual abuse, substance abuse, and violence within the home, DCS waited weeks to remove Ashley and Betty from their home and file a CHINS petition against their mother and stepfather. The CHINS petition

included allegations of substance abuse and having a dirty home, but did not even mention the credible reports of sexual abuse against the sisters.

64.     After removing the children from their home, DCS initially placed the girls with their uncle. This placement failed, and after less than a month, they were moved to their aunt's home, which, upon information and belief, was an unlicensed kinship placement. At the time, the aunt was on medical leave from work, and, upon information and belief, repeatedly informed DCS that she could not continue to care for Ashley and Betty after she returned to work in October. She also informed the service providers that she had no help caring for the children and could not afford to take care of them. As expected, in October 2016, the aunt requested the girls' removal. DCS failed to identify a new placement for the girls despite knowing for over a month that they would need to be moved.

65.     Instead, DCS placed Ashley and Betty in emergency shelter care, where they remained for almost two months. This placement was in direct violation of DCS policy, which does not recommend placement of children under the age of 10 in residential settings, and limits emergency shelter care stays to 20 days unless there are exceptional circumstances and approval from the Deputy Director of Placement Support and Compliance. While Ashley and Betty were in emergency shelter care, their behaviors began to noticeably deteriorate during their weekly supervised visits.

66.     Beginning in December 2016, Ashley and Betty were placed with a series of out-of-home foster parents. Over the course of the next two years, Ashley and Betty cycled through 13 and 14 additional placements respectively, many of which lasted for only a month.

67.     The girls also spent the winter holidays in 2017 in emergency shelter care again. By DCS's own admission in its policy on placement changes, "[d]isruption in placement may have

serious negative consequences for [children's] sense of security and self-worth. A placement change may be another loss, rejection, or possible trauma for [children] and may affect the [children's] ability to form positive attachments in the future." DCS Policy, Ch. 8, § 38, Version 4 (July 1, 2018).

68.    Many of Ashley and Betty's foster parents, as well as their therapists, noticed that the girls displayed sexually maladaptive behaviors. Betty was increasingly violent towards other children, and the girls were physically aggressive with one another. Betty was also sexually acting out on Ashley as a result of the abuse she suffered.

69.    Despite the significant trauma Ashley and Betty reportedly experienced at home and their concerning behaviors while in DCS care, DCS did not provide Ashley and Betty any community-based services until months after they were removed from their home. Upon information and belief, in January 2017, approximately five months after their initial placement, a foster parent requested therapy for the girls to address their concerning behaviors, as well as their cognitive and speech delays. Only after this foster parent's request did DCS enroll Betty in home-based/play therapy and Ashley in speech therapy and home-based/play therapy.

70.    The girls' sexually maladaptive and aggressive behaviors were noted by their therapists as well as during weekly supervised visits with their mother and father.

71.    Ashley and Betty's visits with their father quickly progressed to unsupervised visits at his home. Soon after visits at his home started, the girls' foster parent complained that the father's residence had a flea infestation. As a result, in January 2017, DCS requested that the father's visits revert to being supervised, and the court temporarily ordered supervised visits. DCS noted that the father lacked appropriate housing and displayed concerning behavior when visiting with the girls.

72.     Despite these concerns, in the spring of 2017, DCS placed Ashley and Betty on a trial home visit with their father. At the same time, only a few short months after services began, DCS ended home-based/play therapy for both girls because they had purportedly met their treatment goals.

73.     Per DCS policy, trial home visits are for a period of up to three months, which may be extended in three month increments, "when the safety and well-being of the child can be reasonably ensured" and the child's permanency goal is reunification, there is progress towards the case goals, any safety concerns have been addressed, and the service level of the case can be decreased. DCS Policy, Ch. 8, § 39, Version 5 (Jan. 1, 2019). Service levels are based on a family's risk level, and factors which might suggest that a child can remain safely in a home, include, but are not limited to, whether the non-offending parent demonstrates protective capacities and acknowledges the risk to the child, whether the non-offending parent and child are in a safe location, and other issues, such as substance abuse or mental health, do not pose safety threats. *See* DCS Policy, Ch. 4, § 26, Version 3 (May 1, 2009).

74.     DCS maintains placement and care responsibilities for children who are on trial home visits and the FCM must provide continued services to the family and make weekly face-to-face contact with the children and parent. *See* DCS Policy, Ch. 8, § 39, Version 5 (Jan. 1, 2019); Ch. 8, § 10, Version 11 (Mar. 1, 2019).

75.     Upon information and belief, DCS failed to ensure the girls' well-being while they were living with their father. The trial home visit failed within two months, and DCS requested authorization to remove the girls from their father's home due to allegations of neglect. In the two months in their father's care, Ashley and Betty were dirty, had lice, contracted ringworms, missed service appointments, and had unexplained bruises and injuries on their bodies. In addition, Betty

developed a urinary tract infection, Ashley suffered a black eye, and their father tested positive on two drug screens.

76.     After the failed trial home visit, DCS placed the girls together in a series of non-kinship foster homes. DCS also resumed supervised visitation with the father. Ashley and Betty continued to engage in sexually maladaptive behaviors and fight with one another in their foster homes, during therapy sessions, and during visits. After a several-month disruption in their therapy, DCS re-enrolled the girls in therapy.

77.     During a May 2017 play therapy session, Betty verbalized, for the first time, that her stepfather had sexually abused her. In the summer of 2017, the girls' therapist noted that Ashley was starting to mimic some of her older sister's sexually maladaptive behaviors, and the therapist determined it was best to separate the girls for their therapy sessions. Ashley and Betty continued to report and show signs of trauma during their therapy sessions over the following year. In July 2018, Ashley reported that her stepfather had sexually abused her. Ashley also reported that Betty was sexually abusing her.

78.     The girls continued to cycle through foster home placements, and in October 2018, Ashley (four years old) and Betty (five years old) were separated and placed in different non-kinship foster homes. Ashley was moved again, to her 17th foster home.

79.     Upon information and belief, since October 2018, Ashley and Betty only see each other during their weekly joint-supervised visits with their father.

80.     DCS did not change the girls' permanency goal to adoption until the fall of 2018—two years after they entered foster care and more than a year since Betty had made her own allegations of sexual abuse against her stepfather. At the same time DCS changed the sisters'

permanency goals to adoption, it separated them, making it less likely that the two sisters will be adopted by the same family.

81.     DCS filed a termination of parental rights petition regarding Ashley and Betty, but the judge dismissed it in February 2019 because DCS had failed to meet a statutory deadline. Therefore, the termination of parental rights process had to begin anew, further delaying achievement of the girls' permanency plans.

82.     Upon information and belief, there have been at least three FCMs assigned to the girls, further adding to the girls' experience of instability while in foster care and contributing to case management problems.

83.     When Betty entered foster care, she was assessed to be a Child and Adolescent Needs and Strengths ("CANS") level two. CANS is a tool developed for children's services to support and inform decision-making, including to determine the appropriate level of care and necessary service planning, and to better monitor the outcome of services. Two years later, likely as a result of her traumatic experience in foster care, she was assessed to be a CANS level seven, a more serious level, which typically requires residential placement.

84.     As a direct result of Defendants' actions and inactions, Ashley and Betty have suffered and continue to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Ashley and Betty's cases, and not acted with deliberate indifference to their legal rights, Defendants may well have prevented years of additional trauma the girls have suffered while in the custody of DCS.

### B.    Milo S. and Thomas M.

85.    Milo S. and Thomas M. are brothers. Milo is three years old and Thomas is five years old. Milo has been in foster care for nearly three years—his entire life, and Thomas has been in foster care for over four years. Milo has been in two foster homes. Thomas has been placed in five foster homes and experienced one failed trial home visit. Milo and Thomas currently live together in a pre-adoptive non-kinship foster home. The boys have a half-sister, Caroline T., who, upon information and belief, is eight years old and is placed in a separate non-kinship foster home.

86.    In March 2015, DCS responded to a report that the children's mother and her then-husband were involved in a domestic violence-related altercation. DCS removed Thomas, who was at the mother's home, because of domestic violence and the mother's use of methamphetamine. Upon information and belief, both Thomas and his sister were placed in DCS custody in the home of Thomas's grandmother, where they lived for nearly a year. In February 2016, DCS moved two-year-old Thomas to another foster home or relative placement for less than a week. He was moved again in February 2016 to a foster home or relative placement, where he remained for only four-and-a-half months. Upon information and belief, at some point during these placement changes Thomas and Caroline were placed in separate non-kinship foster homes.

87.    On March 21, 2015, DCS filed a petition alleging Thomas and Caroline were Children in Need of Services, and on April 16, 2015, the children were adjudicated CHINS. On June 8, 2015, the trial court entered its dispositional order on the case, ordering the parents to engage in services.

88.    Upon information and belief, the children were assigned the same FCMs throughout their child welfare proceedings, and, initially, Spencer County DCS was assigned to the children's case. The first FCM assigned to the case was replaced by a second FCM. DCS

terminated the second FCM for filing a false report in connection with the family. DCS replaced her with a third FCM. The third FCM was on the case for a short period of time and was replaced by a fourth FCM.

89.     At some point, the fourth FCM and Caroline's father began engaging in a sexual relationship. Caroline's father testified that the fourth FCM gave him advanced notice of drug screens and informed him that he did not need to continue engaging in certain services.

90.     In March 2016, while Caroline was on a trial home visit with her father, the children's FCM gave Caroline's father a drug screen, which he failed. The FCM assured the father she would "take care of it," but Caroline's father failed a subsequent drug screen as well. He was arrested for violating the terms of his probation and reported the FCM to her supervisor. Soon thereafter, DCS fired the fourth FCM based on her inappropriate relationship with Caroline's father. In March 2016, a fifth FCM took over the children's case.

91.     During this time, the mother was engaged in services, but DCS denied her requests for a trial home visit. On May 24, 2016, the mother gave birth to Milo, and, upon information and belief, DCS allowed the mother to take him home, despite the open CHINS proceeding involving her two other children. Thomas and Milo's father was incarcerated at the time of Milo's birth for failing to register as a sex offender.

92.     On July 8, 2016, DCS sent Thomas and Caroline on a trial home visit with their mother. While on the trial home visit, DCS was obligated to maintain placement and care responsibilities, and the FCM was required to both provide services and make weekly face-to-face contact with the children and parent.

93.     Despite DCS's obligation to closely monitor the family, DCS failed to intervene while the mother neglected all three children during Thomas and Caroline's trial home visit. On

September 6, 2016, following a hearing, the mother went to the local DCS office and admitted to using methamphetamine over the weekend. She stated that while she was using, she left her three children with her elderly father, who was in poor health and unable to care for the children, and her 20-year-old son, who was facing child molestation criminal charges. The mother returned home while she was under the influence of methamphetamine to care for her three children.

94.     On September 6, 2016, DCS removed Thomas, Milo and Caroline. Upon information and belief, at this time DCS filed a CHINS petition against the mother on behalf of Milo. Thomas and Milo were placed in a non-kinship foster home and Caroline was placed with a kinship placement. At the time of his removal, Milo, who was only three months old, had severe scabies, and it appeared as though he had had the scabies for some time. Milo had sores on his back, redness on his feet, and bumps on his face, legs, feet, stomach, arms, back, and in the creases between his fingers and toes.

95.     Milo lasted only one day at his first foster home placement. Upon information and belief, on September 7, 2016, Milo was moved to a new non-kinship foster home, because he was crying too much at his previous placement.

96.     On September 14, 2016, Thomas was moved into the same foster home as Milo. The boys are still in that foster home, which is a pre-adoptive placement. They were separated from their sister because DCS was unable to identify a foster home that could take all three children.

97.     Upon information and belief, DCS played a minimal role, if any, in setting up services and evaluations for the boys. Instead, upon information and belief, DCS relied on Thomas and Milo's foster mother to arrange services and medical appointments. Thomas was initially diagnosed with Adjustment Disorder and attended individual therapy. His foster mother expressed

26

concerns about Thomas's behavior, but the FCM did not arrange for an additional evaluation. Upon information and belief, in December 2018, the foster mother took Thomas in for a neurological-psychological evaluation. Upon information and belief, Thomas was diagnosed with Attention-Deficit/Hyperactivity Disorder and Post-Traumatic Stress Disorder and he was prescribed medication.

98.     Milo is diagnosed with contact dermatitis and eczema. He received physical therapy for a developmental delay until he was about one year old.

99.     DCS also failed to arrange services for the mother. For instance, in February 2017, the mother contacted the FCM to ask for help finding an inpatient substance abuse treatment center. The FCM provided the mother with a list of inpatient treatment facilities but testified it was the mother's "responsibility to get into those places." *A.S. v. Ind. Dep't of Child Servs.*, 111 N.E.3d 207, 210-11 (Ind. Ct. App. 2018). Ultimately, the mother moved in with Caroline's father and lost her job due to lack of transportation.

100.    On January 8, 2018, the parental rights of the boys' mother and father were involuntarily terminated. The mother appealed the termination, and on July 9, 2018, the Court of Appeals of Indiana reversed and remanded the order terminating the mother's parental rights. *See id.* at 213. The mother's parental rights were reinstated on September 11, 2018. In its decision, the Court of Appeals noted that the case involved not only five FCMs, two of whom were terminated for inappropriate behavior, but also four DCS attorneys. *See id.* at 212. The boys' father did not appeal the termination of his parental rights.

101.    In 2018, Thomas and Milo's case was reassigned to a sixth FCM from the Perry County DCS office. Upon information and belief, Perry County DCS took over the case because of Spencer County DCS's serious mishandling of the case.

102.     Upon information and belief, the mother voluntarily surrendered her parental rights in the spring of 2019. The boys are both freed for adoption but have not yet achieved permanency.

103.     As a direct result of Defendants' actions and inactions, Thomas and Milo have suffered and continue to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning, not acted in disregard of professional standards as to the management of Thomas and Milo's cases, and not acted with deliberate indifference to their legal rights, Defendants may well have prevented additional trauma the boys have suffered while in the custody of DCS.

**C.     Jaidyn R. & James M.**

104.     Jaidyn and James are currently in court-ordered out-of-home placement in a non-kinship foster home. The boys have been in the custody of DCS since December 12, 2016.

105.     Jaidyn was born on September 28, 2014 and is four years old. James was born on March 10, 2016 and is three years old. The boys share the same mother but have different fathers.

106.      James was born three months premature and weighed only two pounds at the time of his birth. Upon information and belief, James was born with severely underdeveloped lungs, a possible heart defect, thyroid level abnormalities, and marijuana in his system. Once he was discharged from the hospital, his mother failed to follow through with his required breathing treatments and doctor appointments.

107.     DCS received several reports of suspected child abuse or neglect concerning Jaidyn and James prior to their December 12, 2016 removal. On March 14, 2016, DCS substantiated a report that James was a drug-exposed infant. Upon information and belief, in late 2016, DCS received multiple reports of suspected child neglect, but DCS failed to substantiate any of the reports.

28

108.    On December 7, 2016, the mother called 911 and drove James to a hospital located in Fort Wayne, Indiana, because he was non-responsive. The mother reported that James, who was seven months old and weighed only six pounds, had been lethargic for the previous three days. The mother admitted she was not giving James necessary medication at home and had not taken him to the doctor for months. James was admitted to the hospital for severe malnourishment and a failure to thrive. On the same day, hospital staff made a report of suspected child abuse to the DCS hotline, and DCS opened an investigation.

109.    On December 12, 2016, Jaidyn and James were removed from their mother and her boyfriend, James's father, and placed in a non-kinship foster home. DCS informed the foster parents that James was hospitalized and would likely remain in the hospital for a few months. Upon information and belief, DCS provided the foster parents with incorrect names for the boys, an incorrect Medicaid number, and minimal information regarding their histories or medical needs. This violated DCS's own policy, which requires that DCS provide foster parents with information regarding the reason for the removal, full and accurate medical information, the children's Medicaid numbers and other insurance information, and any special needs, among other things. *See* DCS Policy, Ch. 8, § 9, Version 7 (July 1, 2018). Moreover, upon information and belief, at the time of his initial placement, the foster mother noticed that Jaidyn had large circular scars on his upper thighs that resembled burns from a car lighter.

110.    Upon information and belief, soon thereafter, the foster mother visited James at the hospital. To her surprise, two days later, on December 14, 2016, the hospital told her they were releasing James. DCS neither oversaw the introduction of the foster parents to James nor his discharge from the hospital to their home.

111.     Jaidyn and James's mother gave birth to another baby boy on December 18, 2016. This baby was also born prematurely and was placed in out-of-home care after the mother tested positive for marijuana at the hospital. He was placed in a different non-kinship foster home from his brothers because DCS could not identify a foster home that could care for a toddler and two medically fragile infants.

112.     After leaving the hospital, James had to see an occupational and physical therapist three times a week, a pediatrician once a week, a surgeon as needed, a pulmonologist every month, an ENT doctor as needed, a neonatal intensive care unit doctor, and a Women, Infants, and Children federal grant specialist. James also receives weekly therapy. Initially, Jaidyn only had to see a pediatrician as needed. Upon information and belief, the boys' foster parents secured these numerous appointments without, or with minimal, DCS assistance.

113.     Over the next year, James's foster parents had to take him to the hospital three times and the emergency room twice due to his severe medical issues.

114.     The court entered a CHINS finding against the mother and James's father on February 2, 2017. The same day, the court entered a dispositional finding, continuing the children's placement with DCS and ordering services for the parents. The parents' ordered services included submitting to diagnostic assessments, engaging in substance abuse treatment, submitting to drug screens, engaging in home-based services, completing a psychological assessment, participating in anger management classes, and visiting with their children. Both parents failed to comply with their court-ordered services and repeatedly tested positive for marijuana. In addition, on February 16, 2017, James's father tested positive for trace amounts of cocaine.

115.     The parents were granted supervised visits with the boys twice weekly for a total of eight hours. The parents regularly arrived late and failed to appear for nearly a third of the visits.

They were also permitted to attend the children's medical appointments, but rarely took advantage of this opportunity.

116.    On October 14, 2017, the mother was arrested and criminally charged with Neglect of a Dependent Resulting in Serious Injury, stemming from her neglect of James. Later that month, the mother was evicted from her home, which she shared with James's father. James's father stopped attending visits and participating in any services in the fall of 2017.

117.    On November 14, 2017, DCS, in its Permanency Plan, sought permission from the court to initiate a termination of parental rights proceeding. DCS noted that James's father failed to benefit from services and the boys' mother was incarcerated.

118.    In early 2018, James's father informed DCS that he was homeless and again tested positive for THC with trace amounts of cocaine.

119.    On February 16, 2018, the mother pled guilty and was sentenced to nine years' incarceration with four years executed and five years' probation following her release. She is expected to spend two-and-a-half years in prison, with an early release date, upon information and belief, in the summer or fall of 2019. During her incarceration and probationary period, the mother is prohibited from being around any child under the age of 14. She is permitted supervised visitation with Jaidyn, but not James.

120.    On March 20, 2018, after the boys had been in their foster home for more than two years, DCS abandoned its plan to terminate the parents' parental rights. Instead, DCS, at the behest of the boys' mother and James's father, asked the court to place Jaidyn, James and their younger brother with their maternal great aunt within 90 days. Prior to moving the boys, DCS asked the court to order alternating weekend visitation with the aunt. The aunt had no intention of adopting the boys and indicated she would care for them only until their mother could be reunited with

them—in seven-and-a-half years. The children's guardian ad litem ("GAL") and court appointed special advocate ("CASA") both objected to the proposed move, and, instead, advocated for the three boys to remain in their respective foster homes, all of which were pre-adoptive. The GAL and CASA noted the foster mothers stayed at home with the children in order to meet their extensive medical needs and recommended that DCS file a petition to terminate the parents' rights and change the goal to adoption.

121. On August 6, 2018, DCS again asked that the court transfer all three boys to the aunt's home. Upon information and belief, the aunt still had never met the boys.

122. By October 2018, DCS had lost contact with James's father due to his continued homelessness and failure to notify DCS of his whereabouts.

123. In the fall of 2018, Jaidyn was diagnosed with Post-Traumatic Stress Disorder. At the foster parents' request, DCS submitted a referral for therapy and Jaidyn was evaluated. But the provider agency indicated they did not have sufficient staff to provide Jaidyn with the recommended therapy services. As a result, upon information and belief, his foster parents had to search for a new therapist through a different agency.

124. A hearing to determine whether the children should be transferred to the care of their aunt began in November 2018 and concluded in December 2018. The court heard evidence that James has chronic lung disease; was malnourished and suffered from severe reflux when he first came into foster care; requires oxygen, feeding therapy and breathing treatments; and engages in therapy to address his speech and cognitive issues. The court also learned that, in the fall of 2018, Jaidyn was diagnosed with Post-Traumatic Stress Disorder and participates in weekly mental health and speech therapy. The boys' younger brother likewise suffers from chronic lung disease; is regularly seen by a pulmonologist, cardiologist, and pediatrician; and is involved in multiple

weekly therapies. The court observed that the aunt has one calendar week on and one calendar week off from work and would require a caregiver. Additionally, the children were bonded with their foster parents and lacked an emotional bond with the aunt. A neuropsychologist also testified that removing the children from their foster parents could cause them to develop attachment disorders. Nonetheless, DCS still supported this plan.

125.    On March 11, 2019, the court concluded that DCS's proposed permanency plan of granting the aunt custody of the three boys was not in the children's best interests. The court ordered a permanency plan of termination of parental rights with adoption for all three boys. At this point, Jaidyn and James had been in foster care for two years and three months.

126.    Nevertheless, during a status hearing on April 25, 2018, DCS indicated it was in disagreement with the court's March 11th order and continued to advocate for a change of custody to the aunt. The children's CASA informed the court that a DCS case manager told the foster parents that DCS would not file a termination of parental rights petition and is, instead, going to wait until the mother is released from prison and recommend reunification at that time. However, even if the mother is released in mid-2019, the no contact order will be in place until 2024, prohibiting her from having any contact with James and limiting her to supervised contact with Jaidyn. In addition, the assigned DCS attorney emailed the CASA a few days before the hearing, stating that he had no intention of filing a termination of parental rights petition.

127.    To date, the aunt has never visited Jaidyn and James. The boys have not seen their father in well over six months and have not had contact with their mother since her 2017 incarceration. They have been in the same pre-adoptive foster home for nearly two-and-a-half years, yet due to DCS's mismanagement of their case, Jaidyn and James have failed to achieve permanency.

128.    As a direct result of Defendants' actions and inactions, Jaidyn and James have suffered and continue to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning, not acted in disregard of professional standards as to the management of Jaidyn and James's cases, and not acted with deliberate indifference to their legal rights, Defendants may well have prevented additional trauma the boys have suffered while in the custody of DCS.

**D.    Logan S.**

129.    Logan S. is a 12-year-old boy who entered Indiana's foster care system and became a ward of DCS over 10 years ago. He was born in Chicago, Illinois.

130.    In April 2008, when Logan was two years old, DCS received a report that someone was physically abusing him and there was no food or diapers in his home. When DCS came to the home to investigate, police were in the process of arresting the mother and father. The mother had an outstanding warrant from another state and was also charged with battery. DCS found Logan and his older brother in the home. Logan's brother had scars on his finger, which he said were from the father whipping him with a spatula. The brother also had a burn mark on his body and additional marks on his back. On a later date, the brother reported that the mother used all kinds of "stuff" to whip both him and Logan. During the investigation, DCS observed numerous scars on Logan's body. Logan's brother said that Logan was whipped for drinking water out of the toilet and urinating on the floor.

131.    DCS removed the children and placed them in foster care in April 2008. The court found Logan to be a CHINS in 2008.

132.    The mother's parental rights were involuntarily terminated for Logan on January 8, 2013—five years after entering foster care, when he was six years old.

133.   Logan's father's parental rights were involuntarily terminated on February 6, 2012. He was never involved with the case.

134.   Today, Logan has no contact with his biological parents or siblings.

135.   During his time in foster care, DCS has moved Logan to at least 15 different placements. This exacerbates Logan's history of instability. Prior to entering care, Logan's mother would leave him with other adults while she was incarcerated and later homeless.

136.   DCS placed Logan in emergency foster care with a non-kinship foster family from April 23, 2008 until May 2, 2008. After this, Logan was placed in another foster home for approximately four months. DCS then moved Logan to live with his maternal grandmother in Illinois.

137.   Logan lived with his grandmother for nine months. This placement, however, disrupted after DCS received an Interstate Compact Placement Case Report. Concerningly, this implies that DCS placed Logan with his grandmother before receiving the full Interstate Compact Report, which involves clearances of out-of-state resources and their homes and is required before sending a child out-of-state. Indeed, per DCS policy, DCS will not allow an Indiana child to be placed in another state without written approval from both Indiana's and the receiving state's Interstate Compact on the Placement of Children Office. *See* DCS Policy, Ch. 9, § 1, Version 2 (Mar. 1, 2013).

138.   The Interstate Compact Report revealed that Logan's grandmother had a history with the Illinois Department of Child Services relating to sexual abuse of Logan's mother and a physical abuse case. The Illinois caseworker noted that the grandmother was not affectionate with Logan. Logan also began urinating himself in her home.

139.    DCS then placed Logan back in his first (non-emergency) foster home, where he lived for less than two months. This family initially stated they wanted to adopt Logan, but they changed their minds, because they claimed Logan did not get along with their biological children.

140.    DCS moved Logan to another non-kinship foster home, and he lived there for almost two years before the placement disrupted. DCS returned Logan to his first foster family again—their third attempt at making this placement work, but the placement disrupted again two months later.

141.    In May 2013, DCS placed Logan in yet another non-kinship foster home, his seventh placement in five years. At this point, Logan was legally freed for adoption, but this family was "ambivalent" about adopting Logan and blamed him for anything that went wrong in their home. They refused to cooperate with Logan's bonding therapist and claimed they could not deal with a child who wets the bed.

142.    In January 2014, DCS placed Logan in his first therapeutic foster home with his mentor from his wrap-around services. During this placement, DCS began arranging visits between Logan and his stepmother, who expressed an interest in caring for Logan. Once these visits began, Logan's behavior in his foster home deteriorated. Logan required two acute hospitalizations while in this home, the second of which lasted over a month. DCS filed a report of abuse in the foster home after Logan reported to his FCM that his foster father put him in a physical hold with his hands behind his back, and Logan could not breathe.

143.    DCS transferred Logan to another therapeutic foster home, where he lived for only two months. From July to August of 2016, DCS placed Logan in emergency shelter care in Indianapolis because he was displaying self-harm behaviors, including cutting and banging his head on the wall.

144.     When he was discharged from emergency shelter care, DCS placed Logan in the non-kinship foster home of his Next Friend, Gloria Coyle. Upon information and belief, Logan lived there for one to two years, and he was hospitalized at least once. Ms. Coyle reported that she received minimal information about Logan's family, placement, or developmental history from DCS—leaving her ill-prepared to handle his level of need. This was in violation of DCS policy, which requires DCS to provide the foster parent with "as much information about the child and his . . . case as legally possible." DCS Policy, Ch. 8, § 9, Version 7 (July 1, 2018). By this time, Logan was significantly behind academically, had few friends and poor self-esteem, and experienced issues with incontinence. Logan also had "meltdowns," after which he would beg Ms. Coyle to not have DCS remove him.

145.     Upon information and belief, DCS moved Logan from Ms. Coyle's home because DCS identified an adoptive home for him. Upon information and belief, DCS sent Logan on only two visits with the new family prior the move, leaving both Logan and his potential adoptive parents ill-suited for success. Upon information and belief, the placement quickly disrupted. Upon information and belief, DCS briefly returned Logan to Ms. Coyle's home, but Logan's behaviors had significantly deteriorated due to the failed pre-adoptive placement. Upon information and belief, DCS removed Logan from Ms. Coyle's home and placed him in residential care at a facility that offers day treatment, open residential treatment, psychiatric residential treatment, and emergency shelter care. Logan lived there for between one and two years, until May 28, 2018.

146.     When Logan was discharged, DCS placed him in a pre-adoptive foster home. He was removed from this home less than three months later because Logan claimed his foster parents were "hurting" and "hitting" him.

147.    In August 2018, DCS again placed Logan in emergency shelter care because he had allegedly made false allegations against his foster parents.

148.    Soon thereafter, Logan began engaging in self harm, and, in October 2018, DCS placed Logan in a private secure facility with locked units in northern Indiana. Logan remains there today.

149.    Logan has sickle cell anemia. In September 2018, he was also diagnosed with Post-Traumatic Stress Disorder, Major Depressive Disorder, Attention Deficit-Hyperactivity Disorder, Bipolar I Disorder, and Reactive Attachment Disorder.

150.    Logan has been engaged in mental health therapy during much of his time in foster care to address his many changes in placements, feelings of loss and rejection, and coping skills. However, providers have noted that Logan will likely make little progress in addressing his attachment issues until he is in a permanent placement.

151.    Therapy has also revealed that Logan has received minimal hugging and tactile input through much of his life. This is consistent with sensory processing and sensory-motor areas of deficit, difficulty with emotional and behavioral regulation, fight/flight/freeze responses to stress and anxiety and difficulty with self-soothing skills. While in foster care, Logan received services with an occupational therapist, but those were discontinued due to challenges with payment for services.

152.    Although the court legally freed Logan for adoption in 2013, DCS has left Logan a legal orphan for much of his childhood. Logan longs to be permanently placed in a home and wants a family who will love him and not hurt him. Logan has a history of rejection from his mother and his prospective adoptive parents, which could have been avoided had DCS engaged in appropriate placement matching and given Logan necessary supports.

153.    As a direct result of Defendants' actions and inactions, Logan has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Logan's case, and not acted with deliberate indifference to his legal rights, Defendants may well have prevented years of additional trauma he has suffered while in the custody of DCS. Moreover, if Defendants had provided Logan with sufficient and reasonable services, he may have been able to remain in a less restrictive, non-institutional setting.

**E.    Sara O.**

154.    Sara O. is 14 years old. She first entered foster care in Indiana when she was seven years old.

155.    When Sara was approximately three years old, her mother and father divorced and her mother moved to the east coast and left Sara with her father. Upon information and belief, soon thereafter, Sara's father began sexually abusing her. Upon information and belief, on February 16, 2012, when Sara was seven years old, DCS received a report of the abuse, opened an investigation, and removed Sara from the home. Upon information and belief, DCS filed a CHINS petition against Sara's father, and Sara was placed in court-ordered out-of-home placement with her paternal grandmother.

156.    Sara lived with her grandmother for approximately one year and was then moved to a non-kinship foster home. It is unknown whether the court entered a CHINS finding against Sara's father or criminal charges were brought against him.

157.    In October 2013, when Sara was nine years old, DCS reunited Sara with her father. Upon information and belief, he began sexually abusing Sara again. In May 2014,  DCS removed

her from her father a second time after Sara called 911 to report the sexual abuse she was suffering. The court ordered out-of-home placement for Sara. Upon information and belief, in at least one foster home Sara began to display sexually maladaptive behavior towards other children.

158.    During the following years, upon information and belief, Sara cycled through numerous non-kinship foster homes. Upon information and belief, DCS failed to arrange timely and appropriate services for Sara in each of these placements, further failing this already traumatized child.

159.    In the summer of 2015, DCS placed Sara with her Next Friend, Holly Carrow, on an emergency basis until a bed opened up at a residential facility. Upon information and belief, Sara was terrified to go into the bathroom at Ms. Carrow's home due to the abuse she suffered in her father's home. Upon information and belief, at the time, DCS was working towards a plan of reunifying Sara with her father.

160.    Upon information and belief, Sara experienced at least two acute hospital stays. Upon information and belief, she was placed at a private for-profit residential facility for approximately one year. Upon information and belief, in approximately 2015, DCS transferred Sara to a residential private behavioral healthcare facility. Upon information and belief, at this facility Sara would bang her head on the wall to the point of bleeding.

161.    On March 22, 2016, Sara was placed in a state psychiatric hospital in Indianapolis. She remained there until March 2019. Sara was initially admitted to this hospital because she was displaying aggressive, destructive, and inappropriate sexual behaviors.

162.    Upon information and belief, in September 2018, Sara's treatment team at the psychiatric hospital determined that Sara had reached her maximum treatment benefit and was ready to be discharged to a less restrictive setting. Upon information and belief, Sara's FCM sought

permission to move Sara to a less restrictive residential setting, but did not receive approval to do so despite three separate requests. Upon information and belief, Sara's FCM's requests to transfer Sara to a less restrictive setting were rejected because Sara is pre-adoptive and DCS wanted to wait until a pre-adoptive foster home became available for her. As such, DCS forced Sara to unnecessarily remain in a psychiatric hospital, a traumatizing experience for anyone, especially a neglected and abused child.

163.   Upon information and belief, in March 2019, DCS finally agreed to move Sara to a group home. DCS moved Sara abruptly, with only one day's notice, to a group home north of Indianapolis. Upon information and belief, staff at the psychiatric hospital had advocated that it was important for DCS to implement a therapeutic transition plan when moving Sara to the group home, given her fragile mental health. However, this recommendation was ignored.

164.   Upon information and belief, within a few weeks of moving to the group home, Sara required emergency psychiatric hospitalization and DCS transferred her to the psychiatric unit of a hospital in Indianapolis. After an acute stay, on March 28, 2019, DCS placed Sara in a private secure facility in northwestern Indiana.

165.   Sara is diagnosed with Attention-Deficit/Hyperactivity Disorder, Post-Traumatic Stress Disorder, Child Sex Abuse, and Enuresis.

166.   In total, Sara has been in at least 17 different placements since becoming a ward of DCS.

167.   As a direct result of Defendants' actions and inactions, Sara has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Sara's case, and not acted

with deliberate indifference to her legal rights, Defendants may well have prevented further abuse at the hands of her father as well as years of additional trauma Sara has suffered while in the custody of DCS. Moreover, if Defendants had provided Sara with sufficient and reasonable services, she may have been able to remain in a less restrictive, non-institutional setting.

**F.    Desmond C.**

168.    Desmond has been in court-ordered out-of-home placement under the custody of DCS for seven years. Desmond is 16 years old and currently residing, at the decision of DCS, on the adult wing of a long-term care nursing home facility.

169.    Desmond was born on May 14, 2003 and has a twin brother and younger sister. Desmond has limited verbal skills and requires a wheelchair. Desmond is diagnosed with autism spectrum disorder, cerebral palsy, developmental delay, and dysphasia. Desmond also suffers seizures.

170.    On September 6, 2012, Desmond's home caught fire after a methamphetamine lab Desmond's parents were operating exploded. Desmond and his siblings were inside the home, sleeping on the living room floor, at the time of the explosion. Firefighters and law enforcement responded to the scene. During their investigation, local law enforcement officers discovered drug paraphernalia throughout the home. DCS's Central Intake Unit received a report alleging Desmond and his siblings were the victims of neglect, and DCS opened an investigation and immediately took custody of the children. Desmond and his siblings were transported to the hospital for a routine medical evaluation.

171.    Desmond's mother and father were arrested and charged with Dealing in Methamphetamine, Possession of Methamphetamine, and three counts of Neglect of a Dependent, along with other related charges. They both pleaded guilty to Possession of Methamphetamine and

three counts of Neglect of a Dependent. On October 16, 2013, Desmond's father was sentenced to 10 years in prison with a period of four years' probation following his release. On February 28, 2013, Desmond's mother was sentenced to four years in prison with two years' probation, which she later violated by again using drugs.

172.    Desmond's family was known to DCS prior to the September 2012 fire. On February 8, 2010, DCS substantiated allegations that Desmond's parents medically neglected him and his twin brother. The boys both have cerebral palsy, but the parents had failed to get them any medical treatment for two years. That same month, Desmond's parents entered into an Informal Adjustment agreement with DCS. On April 27, 2012, just months before the explosion, DCS unsubstantiated a report that Desmond's parents were abusing and manufacturing methamphetamines inside their home. At that time, Desmond's parents refused to submit to drug screens. A few months later, on August 16, 2012, DCS unsubstantiated an allegation that Desmond's sister was found a few blocks away from the home without an adult present. On September 1, 2012, five days before the explosion, DCS began investigating a report that Desmond was found alone in the street. His parents agreed to a safety plan and to again enter into an Informal Adjustment.

173.    Pursuant to DCS policy, DCS will initiate a program of Informal Adjustment when a child neglect allegation is substantiated, the voluntary participation of the family in services is the most appropriate course of action to protect the well-being of the children, the parents consent to the Informal Adjustment, and the court approves the Informal Adjustment. *See* DCS Policy, Ch. 5, § 9, Version 8 (Mar. 1, 2019). Here, it is clear DCS failed to properly assess whether an Informal Adjustment was the most appropriate course of action given the evidence of drug use throughout the home. Moreover, as part of an Informal Adjustment, FCMs are required to develop a safety

plan, which an FCM supervisor must approve, to ensure the children are safe. *See id.* FCMs must also monitor the family's progress. *See id.*

174.    When DCS interviewed Desmond's mother in connection with the September 6, 2012 incident, she admitted that she had been abusing methamphetamine for the past ten years.

175.    Following Desmond's removal, the court entered a CHINS finding against Desmond's parents and later terminated their parental rights as to all three children. Today, Desmond's parents have no contact with him.

176.    When DCS removed the children in September 2012, DCS initially placed them together in a non-kinship foster home. Upon information and belief, the foster home was not a therapeutic foster home, and DCS failed to inform the foster parents of Desmond's disabilities, only telling them that Desmond required a wheelchair for traveling long-distances.

177.    DCS did not tell the foster parents that Desmond was non-verbal, incontinent (requiring a diaper), or that he needed a wheelchair anytime he left the house. Upon information and belief, DCS provided no assistance in arranging transportation for Desmond to and from school. In addition, upon information and belief, the foster parents were forced to take it upon themselves to reach out to Desmond's prior school to determine what accommodations he required at his new school. Upon information and belief, they also spoke with his past teachers to find out Desmond's history—they needed to know how to meet his basic needs.

178.    Notably, pursuant to DCS policy, DCS is charged with obtaining education records for children in out-of-home care and reviewing them to determine whether an Individualized Education Program is required and to develop a plan to ensure children's educational needs are met. *See* DCS Policy, Ch. 8, § 20, Version 9 (July 1, 2108); Ch. 8, § 21, Version 4 (July 1, 2108). Upon information and belief, DCS failed to do this for Desmond.

179.     Upon information and belief, Desmond was moved to a new foster home after a week because his first placement was unable to meet his needs, especially without assistance from DCS. Upon information and belief, Desmond's siblings were later split up into two separate foster homes.

180.     Upon information and belief, Desmond lived at his second foster home, the home of his Next Friend, Mr. Foreman, for approximately four-and-a-half years. Upon information and belief, DCS again failed to provide the Foremans with his complete medical history and refused to assist in transporting Desmond to his medical appointments, many of which were several hours away. Upon information and belief, Desmond underwent five surgeries in Indianapolis while he lived in this foster home, one of which resulted in his legs being placed in full casts for several weeks. Upon information and belief, DCS failed to monitor or check in on Desmond while he was hospitalized for his surgeries.

181.     DCS failed to support Desmond in other ways as well. Upon information and belief, DCS failed to ensure visits with Desmond's parents were properly supervised, failed to ensure Desmond's educational needs were met, and failed to ensure necessary accommodations were made so Desmond could remain in his foster home. For example, upon information and belief, the Foremans repeatedly asked DCS to have a wheelchair lift installed in their home, but DCS refused to do so. As Desmond grew older, it became increasingly difficult for his foster parents to lift him in and out of his wheelchair.

182.     Upon information and belief, at one point Desmond's FCM went on leave, and no one at DCS would approve services for Desmond during the several months she was gone. Moreover, upon information and belief, DCS failed to obtain a timely psychological evaluation or arrange independent living skills training for Desmond.

183.    Upon information and belief, Desmond's foster parents, who were left without support from DCS, were forced to put in their notice, seeking to have Desmond moved from their home. In response, DCS, upon information and belief, sent out a referral stating that Desmond required a higher than necessary level of care.

184.    As a result, two years ago, on March 17, 2017, DCS placed Desmond at a nursing facility—on the adult wing. This is in violation of DCS's policy that children be placed in the least restrictive environment available to provide for their individual needs. *See* DCS Policy, Ch. 8, § 1, Version 10 (Jan. 1, 2019). Moreover, under DCS policy, institutional placements are only to be used when there are "extenuating circumstances documented that prevent the child from being placed in the least restrictive, most family-like setting." DCS Policy, Ch. 8, § 4, Version 3 (Dec. 1, 2013).

185.    Though Desmond's disabilities require well-coordinated and supportive care, upon information and belief, one of Desmond's service providers experienced a six to eight month delay when initiating his services due to DCS. Additionally, upon information and belief, Desmond, who was previously attending school full-time, is now only on a half-day school schedule.

186.    Upon information and belief, Desmond has minimal, if any, contact with his sister. Upon information and belief, Desmond's twin brother visits him but without DCS's assistance or coordination. Indeed, upon information and belief, during the pendency of Desmond's CHINS case, DCS has done little to ensure Desmond and his siblings maintain contact with one another.

187.    This is yet another violation of DCS policy, which clearly states that sibling visitation should be promoted for children in foster care. *See* DCS Policy, Ch. 8, § 12, Version 6 (July 1, 2017).  Indeed, visitation plans are to include face-to-face contact with siblings at least once per week. *See id.* Maintaining sibling contact is critical, because, as DCS policy

acknowledges, "[t]he longest lasting relationship a child shares is often with his or her sibling. . . . [T]he ability to maintain contact with each other can help alleviate the emotional impact of removal for each child." *Id.*

188.    Upon information and belief, DCS is attempting to identify an adoptive family for Desmond but has failed to do so thus far, leaving him to unnecessarily languish in an inappropriate, overly restrictive institutional setting. Desmond spends most of his time with elderly adults or adults with developmental disabilities that require a high level of care. He spends very little time, if any, with other children or anyone who does not have a disability, with the exception of his service providers.

189.    As a direct result of Defendants' actions and inactions, Desmond has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Desmond's case, and not acted with deliberate indifference to his legal rights, they may well have prevented years of additional trauma he has suffered while in the custody of DCS. Moreover, if Defendants had provided Desmond with sufficient and reasonable services, he may have been able to remain in a less restrictive, non-institutional setting.

## III.    DCS'S SYSTEMIC FAILURES AND RESULTING HARM TO CHILDREN.

### A.    Director Bonaventura's Resignation.

190.    Indiana is in dire need of an effective child welfare system.  The state is plagued by high rates of child abuse and neglect, with the third highest rate of general child maltreatment in the country. It also has the fourth highest number of children in foster care in the nation. Notably, the child abuse and neglect rate in Indiana has nearly doubled over the past decade. In 2017, Indiana had a child abuse and neglect rate of 20.8 per 1,000 children compared to only 11.9 per

1,000 children in 2007. Without a doubt, DCS has proven incapable of ensuring the safety and well-being of the Hoosier youth.

191.    Former DCS Director Bonaventura highlighted the systemic issues with Indiana's child welfare system in her December 12, 2017 letter of resignation to Defendant Governor Eric Holcomb.

192.    Director Bonaventura noted that the years before her appointment "were marked with conflict and strife between DCS and the provider community, including foster parents . . . ." Letter from Mary Beth Bonaventura, Dir. DCS, to Eric Holcomb, IN Gov. (Dec. 12, 2017).

193.    According to Director Bonaventura, DCS distorted its data regarding staffing levels prior to 2013, "manipulat[ing]" the "officially reported staffing numbers . . . to the point that they were nothing more than pure fantasy." *Id.*

194.    Director Bonaventura attempted to remedy DCS's internal failures. However, Defendant Holcomb's staff "cut funding and services to children in the midst of the opioid crisis," thus threatening the safety, permanency and well-being of children in foster care. *Id.* Moreover, according to Director Bonaventura, Defendant Holcomb undertook "efforts to reduce or cap" FCM and DCS attorney staffing, and made no attempt to collaborate with the provider community in setting rates and forming licensing rules. *Id.* Therefore, Director Bonaventura wrote, she felt she was compelled to resign, because "Hoosier children [were] being systematically placed at risk…" *Id.*

**B.    The CWG Report.**

195.    The June 18, 2019 CWG report that followed Director Bonaventura's resignation found serious, systemic deficiencies within DCS. Among other things, CWG's report noted DCS's high removal rates; poor data collection system; uneven workloads that, at times, far exceed

national caseload standards; highly centralized management that causes unnecessary delay in services; uneven interpretation and implementation of DCS policies across counties; and inexperienced attorneys with high turnover rates. *See* CWG, *Evaluation of the Indiana Department of Child Services* (June 18, 2018). The CWG Report revealed that, for years, Defendants have proven ill-prepared and incapable of appropriately handling  reports of suspected child abuse and neglect.

196.    CWG made 17 recommendations to address DCS's most significant challenges, which included, but were not limited to: reclaiming a family-centered practice model, which requires understanding "the harmful effects of child removal and disrupted attachment for children as a counterbalance in considering whether removal is the safest course of action"; establishing caseload standards of no more than 17 families for in-home services and 15 children for out-of-home cases; creating a small unit of data professionals to analyze the data DCS collects; strengthening DCS's quality assurance capacity; reducing the supervisor-to-caseworker ratio to one supervisor for every five FCMs; addressing the culture of fear within DCS; developing a strategy for recruiting, training, and retaining staff; decentralizing decision-making within DCS; assessing counties where CHINS cases remain open for lengthy periods of time; using a Medicaid expert to assist DCS in maximizing the use of Medicaid for services; resolving attorney turnover issues; and forming better partnerships with the provider community. *Id.*

197.    Defendants have been long aware of these shortcomings of Indiana's child welfare system, but they have failed to act in a meaningful way to address the noted deficiencies.  As the CWG noted, "in *five years*, external evaluators have prepared five evaluation reports about DCS, requiring much time on behalf of evaluators and DCS staff and leadership" but "[a] large number of these recommendations have not yet been implemented." *Id.*

C.      DCS's Deficient Federal Audit Results.

198.    Federal audits have consistently revealed flaws with Indiana's child welfare system. Since the early 2000s, the Children's Bureau of the United States Department of Health and Human Services has conducted audits of each state's child welfare system.  These audits are called Child and Family Service Reviews ("CFSR"). As part of each CFSR, the Children's Bureau conducts a review of 65 randomly-chosen cases in each state. Indiana has been evaluated three times through the CFSR process—in 2002, 2008 and 2016.

199.    The CFSR evaluates seven "outcomes" of the safety, well-being and permanency of children in foster care, which are considered the three objectives of all child welfare systems pursuant to federal statutory law. The CFSR also reports on seven "systemic factors," which are practices and structures that affect the delivery of foster care services. Taken together, these metrics provide a comprehensive analysis tool for each state by identifying areas of weakness with the goal of then implementing corrective actions to improve outcomes for children.

200.    Unfortunately, outcomes for Indiana's children have not improved since the CFSR process was initiated.  In fact, Indiana's performance has worsened in each subsequent CFSR.

201.    Indiana received its worst CFSR  in 2016,  failing to achieve any of the "outcomes" relating to the permanency, safety, and well-being of children in care. During that year, Indiana was in substantial conformity with *just one of the seven systemic factors*. *See* U.S. DEP'T OF HEALTH AND HUMAN SERVS., ADMIN. FOR CHILDREN & FAMILIES, INDIANA FINAL REPORT (2016).

202.    In the area of safety, the Children's Bureau decided that "children are, first and foremost, protected from abuse and neglect" in only 35 percent of the cases reviewed. *Id.*  The Children's Bureau determined that just 30 percent of the children had "permanency and stability in their living situations." *Id.* Indiana DCS is also struggling to provide for the well-being of

children in its care; the Children's Bureau determined that families have "enhanced capacity to provide for children's needs" in just 33 percent of the foster care cases that were reviewed. *Id.*

203.    Indiana has struggled with many of the CFSR's systemic factors, which are measures of how the child welfare structure functions. Indiana did not achieve "conformity" on the CFSR for its Case Review System, which includes items such as case plans, permanency hearings and termination of parental rights proceedings. *Id.* Indiana's own internal quality assurance review revealed that DCS often fails to develop written case plans in conjunction with parents. *See id.* The Children's Bureau's review also revealed that timely filing of termination of parental rights petitions are an "area of challenge" in the state. *Id.*

204.    The 2016 CFSR also rated Indiana as deficient in "Service Array and Resource Development," as it lacked qualified service providers in a variety of areas, such as substance abuse, mental health, domestic violence and services to mentor youth. *Id.* Further, the 2016 CFSR found that Indiana needed improvement on the diligent recruitment of foster and adoptive homes. *See id.*

**D.    Inadequate Assessments and Responses to Reports of Child Abuse and Neglect.**

205.    Indiana has the third highest rate of child maltreatment in the country. According to the Children's Bureau of the U.S. Department of Health and Human Services "Child Maltreatment" report, Indiana had 29,198 child victims in 2017—a 34.2 percent increase from 2013. This represents a rate of 18.6 victims per 1,000 children—more than double the national average.

206.    Indiana has the highest rate of court-involved maltreatment victims of any state of the 41 states reporting. In 2016, over 72 percent of Hoosier child victims had court cases, compared with a national average of 29 percent. In Indiana, cases are either adjudicated as a CHINS or

Informal Adjustment. The degree to which Indiana courts monitor Informal Adjustments depends on the local judge, with some simply signing off on the Informal Adjustment authorization. Unlike other jurisdictions, DCS does not appear to enter into voluntary out-of-court agreements to provide services to families, likely resulting in the state's high rate of court involvement.

207.    The CWG Report noted a sharp increase in the number of children in out-of-home care in Indiana. From September 2005 to September 2017, DCS reported that the number of children in out-of-home care almost doubled, from 10,767 to 20,394 children. Additionally, as of 2017, Indiana's rate of children in out-of-home care was approximately twice the national average, at 13 children for every 1,000 in the state. Meanwhile, three of Indiana's neighboring states (Illinois, Michigan, and Ohio) experienced *decreases* in the number of children in out-of-home care during the same period of time.

208.    After the release of the CWG Report, DCS tried to reduce the number of children in care, appearing to focus more on the numbers than on providing meaningful services. From December 31, 2017 to December 31, 2018, DCS reduced the number of open CHINS cases from 28,502 to 23,908, a decrease of 16 percent in just one year. On December 31, 2018, DCS reported having 14,789 children in out-of-home placements, which is 1,618 fewer children than in May 2018 and quadruple the decline over the same period in 2017. But inappropriately screening out, entering into Informal Adjustments rather than filing CHINS petitions, or hurriedly closing cases places children in danger of remaining in or being returned to potentially unsafe homes.

209.    The large number of out-of-home placements is understandable in the context of DCS's involuntary removal policy, which applies when DCS "will remove a child from his or her parent, guardian, or custodian." DCS Policy, Ch. 4, § 28, Version 7 (July 1, 2018). Notably, the grounds warranting an involuntary removal under DCS policy closely mimic the statutory

language for finding a CHINS. CWG concluded that DCS's policy "seems to encourage removal over consideration of other options that might protect the child while avoiding the trauma associated with his or her placement outside of the family." CWG, *Evaluation of the Indiana Department of Child Services* (June 18, 2018).

210.    While DCS often removes children inappropriately, the agency also fails to remove children and make effective safety plans when necessary. CWG's analysis revealed that FCMs would develop safety plans with substance-abusing parents and caregivers in which the parents would merely promise to refrain from using drugs in the presence of their children. Several of these cases involved young children and parents or other adults in the homes who were actively abusing opiates and methamphetamine. This is unsound safety planning, especially when parental "use of substances may well be beyond their control." *See* CWG, *Evaluation of the Indiana Department of Child Services* (June 18, 2018).

211.    Defendants' failures to adequately assess and respond to allegations of child abuse and neglect substantially depart from widely-accepted professional standards and demonstrate a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**E.    Inadequate Child Placement Array.**

212.    Indiana lacks a sufficient placement array, *i.e.*, the types of residential settings or homes into which DCS may place a foster child,  all too often leaving children in inappropriate and dangerous environments.

213.    DCS not only has the authority to place children in residential, institutional settings, it also licenses those same facilities and is responsible for ensuring that minimum standards are met. DCS issues licenses for (a) child care institutions (which have a capacity of over 10 youth for stays over 60 days); (b) emergency shelter care services (which must not exceed stays of 60 days);

(c) private secure facilities  (which are locked units within an institution designed to serve children who are determined to be "gravely disabled" with a capacity of over 10 youth for stays over 60 days); (d) group homes (which house a maximum of 10 youth for over 60 days); (e) emergency shelter care group homes (that provide emergency shelter care services for less than 60 days); and (f) licensed child placing agencies (which license and monitor some foster homes).  DCS also licenses a portion of Indiana's foster homes.

214.    In addition to licensing, Indiana also contracts with private providers for residential services for children in foster care, congregate care, or treatment, including psychiatric hospitalization.

215.    Instead of providing children with disabilities with access to in-home or community-based support services, DCS often places these children—and specifically those with developmental disabilities or significant mental illness—in residential, institutional facilities. Instead of exploring another appropriate, less restrictive community placement, these children are often needlessly and inappropriately housed in highly restrictive institutional settings. These unnecessary institutional placements create another significant barrier for the children's permanency plan and violate the children's right to receive services in the community.

216.    DCS has also failed to provide children with appropriate services and accommodations within residential settings or has failed to ensure residential treatment is appropriate for the individual child, thus subjecting children to prolonged institutionalization and inappropriate placements.

217.    Upon information and belief, while the high percentage of youth in kinship (or relative) care appears laudable, many of these kinship placements are unlicensed foster homes and some are beyond the realm of ordinary fictive kin (*i.e.*, a person who knows the child but is not

related by blood, such as a godparent). Upon information and belief, DCS exercises less scrutiny over unlicensed relative homes. Additionally, upon information and belief, DCS at times has inappropriately placed children in the homes of their service providers and DCS employees, classifying these homes as "kinship" placements.

### F.    Overreliance on Institutional Placements.

218.    Rather than correcting the licensure issues causing the shortage in residential placements, DCS relies upon child caring institutions to house children for extended periods of time. DCS fails to take proactive steps to move children out of institutional care even after the child has met the maximum therapeutic value of the facility or in instances where the placement is not appropriate or therapeutic for the child.

219.    In June 2018, Indiana had 128 active residential treatment licenses, which included child caring institutions, private secure facilities, and group homes. Upon information and belief, approximately nine are run by DCS county offices, 25 percent are private for-profit facilities, and the remainder are private non-profit facilities. CWG found that Indiana still has a "gap in resources" for children who require placement at a level higher than a foster home but lower than a residential treatment center, such as a therapeutic foster home. CWG, *Evaluation of the Indiana Department of Child Services* (June 18, 2018).

220.    Often, by the time children enter residential care, they have already experienced multiple placements, including kinship and non-kinship foster homes, and perhaps emergency shelter care placements. When youth have multiple placements, they are more likely to have difficulty stabilizing.

221.    There are a number of large child caring institutions and private secure facilities in Indiana. Notably, most of these accept youth from both DCS (CHINS) and probation. In fact,

DCS's Juvenile Justice Program makes "all services within the DCS service array" available to the county probation departments for juvenile delinquencies, including placement in residential treatment facilities, group homes, and foster care. Letter from Terry Stigdon, Dir. DCS, to Jason Dudich, Dir. State Budget Agency (Aug. 20, 2018). The CWG Report stated that DCS's practice of placing CHINS and probation youth together occurs throughout Indiana, "which is counter to requirements that they be placed separately." *See* CWG, *Evaluation of the Indiana Department of Child Services* (June 18, 2018).

222.     Title IV-E of the Social Security Act provides federal matching funds to help states, including Indiana, pay for foster care placements for children who meet certain eligibility criteria. In Indiana, DCS is responsible for administering the state's Title IV-E funds, for which both child welfare and juvenile delinquency services are eligible. But facilities do not qualify for funding if they are "detention facilities . . . or other facilities operated primarily for the detention of children determined to be delinquent." National Juvenile Justice Network, *Title IV-E for Youth in the Juvenile Justice System*, njjn.org, http://www.njjn.org/uploads/digital-library/resource_425.pdf (last visited June 20, 2019). Concerningly, upon information and belief, some DCS-licensed residential facilities house more youth sent via probation than CHINS.

223.     Moreover, DCS relies upon potentially unsafe facilities.  Specifically, nine of DCS's residential facilities are owned and operated by Acadia Healthcare, a publicly traded for-profit company. One analyst recently shorted Acadia stock amid allegations that "the company has concealed widespread patient abuse and neglect that results from pervasive understaffing at its facilities." Aurelius Value, *Acadia Healthcare: Destructive Greed*, www.aureliusvalue.com, http://www.aureliusvalue.com/research/acadia-healthcare/ (last visited June 20, 2019). The

scathing analyst report further claimed that Acadia's "business model depends on acquiring new facilities and then degrading care…" *Id.*

224.    For instance, Resource Treatment Facility, an Acadia-operated facility, has garnered media attention because there were reports of violence within the facility and a large number of youth ran away. In each month between January and November 2017, there were more than 35 resident-on-resident assaults and 28 resident-on-staff assaults at Resource, which only housed an average of 81.9 children per month. A former employee told reporters that staff working with youth with significant mental health issues were young and underqualified. Staff members were often violent with children, would encourage them to fight one another, and used restraints daily. This former employee also alleged that one male staff member engaged in sexual activity with female residents.

225.    DCS has failed to take sufficient steps to ensure that children with disabilities in the foster care system have access to medical and mental health and requisite support services to allow them to remain in the least-restrictive, most family-like setting. Instead, children with disabilities are unnecessarily placed in segregated institutional treatment facilities for extended periods of time, and DCS has failed to take proactive steps to integrate these children back into the community or ensure that they are placed in healthy, therapeutic environments that can support their needs.

226.    Further, children with disabilities that are placed by DCS within child caring institutions may be subjected to substandard care and treatment, excessive physical restraints, an institutional environment, and limited community access. The providers are allowed to continue these improper practices, thus causing further traumatization, as DCS is the placement agency, funding source, and is responsible for licensing and overseeing the conditions and practices. This

conflict of interest means that DCS has little incentive to improve the conditions as they are reliant upon these institutions for bed availability for children that are challenging to place.

227.     Children living in the residential settings have little to no autonomy over their daily lives. Their activities of daily living and standards for whether they have complied with treatment, and are thus eligible for a less restrictive setting, are restricted and limited by inflexible rules and policies. Children in residential settings are subjected to blanket rights restrictions that are not tailored to individual needs, structured meal times, limited visitation without outside adults or providers present, and restricted movement to any other location besides the facility, including access to a community-based school. As a result, all aspects of their daily lives are controlled by the residential provider, and they have very few, if any, meaningful opportunities to participate in or access the community.

228.     These residential settings also provide little opportunity for children with disabilities to interact with individuals without disabilities, apart from staff and case workers that may do in-person visits, and they are subjected to the same conditions and restrictions as children that are placed for disciplinary reasons through the juvenile justice system.

229.     The types of services needed to support children with disabilities in community-based settings already exist in DCS's service system. However, these services are not implemented in a consistent or timely manner, nor are they sufficiently provided to meet the needs of children who are unnecessarily institutionalized or those at serious risk of institutionalization. With reasonable modifications, including expansion of the capacity to provide existing services, reallocation of funds from institutions to community integration services, and additional training and support to FCMs working with children with disabilities, Indiana would be able to meet the

needs of children with disabilities or significant behavioral needs in a less restrictive environment than institutionalization.

230.   These failures in Indiana's use of residential placements substantially depart from widely-accepted professional standards and demonstrate a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**G.    Foster Home Shortage.**

231.   Indiana has also  failed to recruit and retain an adequate number and range of foster parents. Indeed, over the past few years, media outlets have reported a dire shortage of foster homes in Indiana.

232.   DCS is responsible for licensing all foster homes, and licenses are issued for four-year periods. Both DCS and the licensed child placing agencies find foster homes for children and manage and train foster families. Licensed child placing agencies also train foster parents for foster children with disabilities and therapeutic foster home licenses.

233.   In Indiana, the timeframes for attaining foster home licensures vary by region. Many regions suffer from lengthy administrative delays. One county allegedly told foster parents it takes a year because they lack sufficient staff to process the licenses.

234.   As a result of Indiana's foster home shortage, DCS often has nowhere to place children. Children are forced to sleep in local DCS offices, sent to emergency shelter care for extended periods of time, placed unnecessarily in an institution, or placed in foster homes that are filled past their licensed capacity limits.

235.   The shortage of foster homes means that children are frequently placed far from their homes. In November 2017, nearly 35 percent of children were placed outside of their home counties. The problem is more acute in rural areas, with nearly half of children placed in other

counties. The CWG Report found that some children are placed three-to-five hours away from their home communities and schools. This inhibits children from maintaining meaningful contact with their families and support networks. Lengthy travel is also burdensome to caseworkers, who are required to see children monthly.

236.    These failures in Indiana's use and number of foster homes substantially depart from widely accepted professional standards and demonstrate a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**H.    Emergency Shelter Care.**

237.    DCS places children in emergency shelter care—a short-term placement that is meant to provide temporary, 24-hour care—far too often and for far too long. Because Indiana lacks sufficient resources to handle the increased volume of children in its care, when children are removed from their homes, they are often placed in inappropriate or inadequate temporary placements. These are typically group or institutional facilities, upon information and belief, sometimes with a separate designated area for emergency shelter care beds.

238.    According to DCS policy, emergency shelter care stays must not exceed 20 days without approval. The emergency shelter facility or Local Office Director can request an extension if DCS has not identified a permanent placement for the child at the end of 20 days. DCS policy also mandates that DCS must seek court approval for all emergency shelter care placements within 48 hours of a child entering such a facility. DCS policy imposes additional restrictions, recommending that no children under the age of 10 be placed in emergency shelter care.

239.    In contravention of these legal and policy requirements, DCS unnecessarily places children of all ages in emergency shelter care.  Overburdened FCMs have insufficient time to engage in meaningful case planning and placement matching, and Indiana lacks an adequate array

of placements. As a result, children are placed in emergency shelter care, thus needlessly subjecting them to institutionalization for extended periods of time.

240. For example, Plaintiffs Ashley W. and Betty W. lived in emergency shelter care for months when they were toddlers, which is against DCS policy's minimum age requirement. Logan was also placed in emergency shelter care as a nine-year-old.

241. Moreover, providers offering emergency shelter care are regularly forced to request placement extensions as a result of DCS's failure to identify appropriate long-term placements within 20 days. Due to DCS's failures, children often remain in these temporary placements for months. Upon information and belief, some of these youth, especially teens, are left at the facilities and transitioned from emergency shelter care beds to long-term residential beds at the same institution when DCS is unable to identify placements for them.

242. DCS's overreliance on emergency shelter care defies extensive evidence and guidance in the child welfare field about the importance of minimizing institutional care for children. Moreover, these temporary emergency shelter care placements mark yet another placement for children, despite undisputed best practices in the child welfare field to minimize the number of placements.

243. Children in emergency shelter care are at increased risk of educational and service disruptions as well. This becomes increasingly problematic the longer children are left in emergency shelter care. Children who are not in school or remain without services fall further behind, and it is challenging for them to catch up to where they were when their education and services resume.

244.    These failures in Indiana's use of emergency shelter care substantially depart from widely-accepted professional standards and demonstrate a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**I.     Defendants Fail to Adequately Train, Supervise and Retain Caseworkers.**

245.    While many FCMs undoubtedly want to help children and their families, FCMs in Indiana face many obstacles that prevent them from effectively performing their critical job functions.

246.    In Indiana, FCMs bear case management responsibilities for out-of-home CHINS cases. FCMs must assess family needs regarding child safety and well-being, identify service needs, make referrals for services, work with families and service providers to assess progress, and provide necessary information to the court.

247.    FCMs in Indiana experience low morale and repeatedly described a "culture of fear" at DCS. CWG, *Evaluation of the Indiana Department of Child Services* (June 18, 2018). Even more alarming, some FCMs reported to CWG that they did not feel safe to "tell the truth." *Id.* They reported feeling unable to bend policy, even if they thought it would lead to better outcomes.

248.    Moreover, FCMs reported that "DCS does not have a learning culture," and that they fear supervisors will punish them for acknowledging any lack of knowledge or skills or for asking for help. *Id.*

249.    Not surprisingly, this translates to a high turnover rate within DCS. As of March 2018, FCM turnover at 12 months was 30.4 percent. A 2017 report found that *more than half* of FCMs who leave DCS do so within the *first two years*. *See id.* And CWG found that "[h]igh levels

of turnover, especially among FCMs, was among the most commonly cited themes in the interviews conducted over the course of the review." *Id.*

250.    There are many reasons for this high rate of FCM turnover, including unmanageable workloads, lack of support, required on-call and overtime work, and pay that is incommensurate with the demands of the job.

251.    High FCM turnover leaves families in a "chronic state of re-introduction and re-assessment." *Id.* High turnover also creates discontinuity of services. When FCMs are inexperienced, poorly trained, and overwhelmed with unmanageable caseloads, permanency is "lost in the mix." *Id.*

252.    Indiana's high turnover rate for FCMs has significant negative consequences for the children in foster placements and institutional settings. Research has shown that high caseworker turnover is strongly correlated with children experiencing multiple placements, receiving fewer services, remaining in foster care longer, and failing to achieve permanency. In addition, FCMs reported that high rates of turnover and "the constant state of cases being re-assigned is a stressor." *Id.* FCMs acknowledge that turnover negatively affects families, "as [FCMs] were regularly sent to work with families who had just established a relationship with the prior FCM[s]." *Id.* Birth parents reflected this sentiment, expressing frustration that they had to "start over" with each subsequent FCM. *Id.*

253.    Additionally, many FCMs in Indiana carry higher-than-standard and statutorily mandated caseloads. Until June 2019, FCMs were prohibited under state law from carrying caseloads involving more than 17 children. As of June 13, 2019, with the passage of new legislation, that number was reduced to 13 children in out-of-home placement. Despite this, in 2018, CWG found that FCMs commonly carry caseloads of 25 to 35 children. CWG even found

that one FCM had a caseload of *52 children*, several of whom were placed several hours away. The CWG created a DCS weighted caseload management report for May 2018, which revealed that an additional 421 caseworkers are required in order to meet Child Welfare League of America caseload standards.

254.    DCS has recently reported that it is now 99 percent compliant with caseload standards and has reduced FCM turnover by 18.7 percent in the past year. Notably, however, FCM turnover is still extremely high—with a quarter of the FCMs turning over in 2018, even after many FCMs received salary raises in 2018. Additionally, year after year, studies have pointed to high caseloads and high turnover within DCS, but DCS repeatedly failed to find sustainable solutions. After the CWG Report was publicized, DCS hurriedly found ways to improve its caseload and employment statistics, but, if the past is any indicator of future performance, the recent fixes are likely not long-term solutions. And, even if DCS's problematic caseloads were resolved, many other issues remain with Indiana's child welfare system.

255.    Moreover, the already overwhelmed FCMs are subjected to further stress from DCS's highly centralized structure, which requires them to constantly seek approvals during the pendency of their cases. This organizational structure causes delays in cases, as FCMs often lack authority to make decisions or offer services. Instead, parties must wait for DCS upper management or the central office to make decisions regarding case planning. For instance, even where there are compelling reasons not to terminate parental rights, some Local Office Directors require Regional Managers to approve casework recommendations for children who have been in foster care 15 out of the last 22 months, causing even further delays. Delays in these cases put families, who are already on the brink of permanently separating, at significant risk of harm.

256.     Defendants' failure to employ a sufficient number of caseworkers and qualified supervisors, and failure to adequately train them and ensure that they carry reasonable caseloads, substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**J.     Inadequate Case Planning and Insufficient Services.**

257.     DCS's high staff turnover and high caseloads have and continue to impair effective case planning.

258.     Upon information and belief, many children in Indiana foster care do not receive appropriate case plans that fully comply with the federal requirements for such plans, such as the requirements that they include a discussion of how the case plan is designed to achieve a safe placement for a child in the least restrictive and most family-like setting, a description of services offered, and documentation of the steps required to finalize a placement when the goal is adoption or another permanent home. *See* 45 C.F.R. § 1356.21(g). Furthermore, children may not receive necessary services that are recommended in their case plans due to (i) Defendants' failure to make timely referrals and (ii) FCM's excessive caseloads, which preclude them from effectively managing each child's case effectively.

259.     FCMs rarely adhere to the practice model concerning Child and Family Team Meetings ("CFTMs"), which are meetings in which DCS and service providers discuss the progress of the case and families' goals.

260.     Under DCS policy, CFTMs are held at "critical junctures throughout the life" of a case, which can include assessing the need for a removal, developing a case plan, revising a permanency plan prior to court, safety and service planning, changing a permanency plan to another planned, permanent living arrangement for older youth, or changing a placement. DCS

Policy, Ch. 5, § 7, Version 5 (July 1, 2015). DCS often fails to prepare families for CFTMs and fails to communicate the purpose of the meetings.

261.   Some families reported to CWG that their planning consisted of FCMs simply doling out directives, rather than asking for their input. Other parties, including foster parents, therapists, extended family, and CASAs are frequently excluded from the meetings. Providers also reported that DCS regularly fails to include them in CFTMs; when DCS does include them, DCS rushes through CFTMs in court or immediately before or following hearings. CWG reported that relatives, providers, community resources, educators, and perhaps alleged or legal fathers and paternal relatives were usually not involved in CFTMs.

262.    Providers estimated that CFTMs occurred in only 50 percent of key decisions. Instead, important issues surfaced in court.

263.   Moreover, CWG noted that FCMs failed to conduct comprehensive family functional assessments during the case planning process. This leaves FCMs without critical information regarding families' needs, which hampers their ability to make meaningful service referrals.

264.   Defendants' failure to engage in adequate and meaningful case planning substantially departs from widely-accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**K.     Poor Placement Matching.**

265.   DCS further harms children by often placing them in inappropriate foster placements that are ill-equipped to meet their needs. Upon information and belief, DCS fails to engage in effective placement matching, instead hurriedly placing youth in the first available placement.

266.    Foster parents report that FCMs have failed to provide them with accurate or pertinent information about children before placing them in their homes. Foster parents are therefore unprepared to meet the children's needs, which ultimately increases the likelihood of placement instability.

267.    The named Plaintiffs' experiences, described in detail above, illustrate how poor support in a foster home might lead to instability, whereby children are shuffled from foster placement to foster placement.  For instance, DCS placed Logan in multiple foster homes and pre-adoptive homes without fully informing those placements about his history and needs. DCS also  failed to consider the most appropriate  type of home that would best support Logan's needs and his disability. As a result, many of Logan's placements failed, further traumatizing him.

268.    Upon information and belief, DCS also pushes premature trial home visits. This practice only re-traumatizes children if the trial home visits fail and DCS has to conduct another removal. And, as with Plaintiffs Ashley W. and Betty W., inappropriate trial home visits may place children at risk of harm.

269.    DCS frequently, and often abruptly, moves the foster children in its custody from placement to placement.  For instance, Ashley, Betty, Sara, and Logan have all been in well over a dozen different placements since becoming wards of DCS.  Placement changes negatively impact children's education, therapy, and access to services.

270.    Shuffling children from foster placement to foster placement negatively affects their well-being in other ways too. Children are sometimes transferred to new placements with no explanation of where they are or why. This degree of turbulence and uncertainty can lead to emotional trauma and attachment disorders, and causes children to have feelings of instability and

insecurity. Frequent moves may also result in children losing contact with their siblings, relatives, community supports, friends, and other adults in their lives.

271.    Defendants' failure to ensure placement stability to children substantially departs from widely-accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**L.    Insufficient and Ineffective Services.**

272.    Federal law requires states to provide a continuum of services, such as mental health treatment, visitation, domestic violence victim support and batterer intervention, and drug screening, in order to protect and promote the welfare of children; prevent the neglect, abuse and exploitation of children; support at-risk families through services that allow children to safely remain with their families or return home in a timely manner; promote the safety, permanency, and well-being of children in foster care; and provide training, professional development, and support to ensure a well-qualified child welfare workforce. *See* 42 U.S.C. § 621.

273.    Despite the high number of contracted community-based service providers, Indiana lacks a sufficient array of services necessary to meet the needs of children and families involved with its child welfare system. Further, FCMs fail to ensure that children access services that are available in a timely manner, contrary to legal requirements. Hoosier children and their families often remain on waiting lists for services, or are never referred at all. Accurate and necessary information about children's circumstances, including medical and social histories as well as special needs, are withheld from foster parents or residential providers.

274.    Services are critical to the well-being of children in DCS custody, who are particularly vulnerable for a number of reasons. Children in foster care have often experienced severe and chronic trauma and may have been exposed to other stressors, such as extreme poverty

or parental substance abuse. Research shows that children exposed to repeated traumatic stress or pervasive neglect, including children removed from their homes due to allegations of abuse or neglect, manifest increased physical, psychological, and emotional problems later in life. Traumatic foster care experiences, without adequate services, only compound these problems.

275.     In Indiana, FCMs often fail to ensure children are assessed and receive necessary services in a timely manner. Rather, FCMs often abdicate these responsibilities to foster parents, relying on them to proactively seek or request services without DCS oversight or guidance.

276.     In the 2016 CFSR, the Children's Bureau found severe service gaps for substance abuse, mental health, domestic violence and youth mentoring. *See* U.S. DEP'T OF HEALTH AND HUMAN SERVS., ADMIN. FOR CHILDREN & FAMILIES, INDIANA FINAL REPORT (2016). In the areas for which services are offered, upon information and belief, many of the service providers, including those providing mental health services, are ineffective and of poor quality. Nevertheless, DCS continues to renew contracts with these substandard service providers.

277.     The CWG Report noted that some FCMs think they cannot or should not request services for CHINS.  Further, a group of FCMs said that home-based services were "not allowed anymore." CWG, *Evaluation of the Indiana Department of Child Services* (June 18, 2018). CWG found that "[m]any FCM's were repeatedly uneasy about requesting or approving services." *Id.* Reviewers heard that this wariness was rooted in a lack of autonomy perceived by the FCMs, coupled with heightened scrutiny around local spending in particular.

278.     FCMs reported that it takes weeks to complete certain referrals, waitlists are months long, and some services are long distances away. CWG concluded, "one thing was obvious: the FCMs do not have a clear sense of what treatment is and isn't available; whether it can be paid for by DCS; and what is occurring at the leadership level to combat addiction." *Id.* Concerningly,

"FCMs may also be expected to administer drug tests, a duty that raises serious concerns . . . regarding family engagement and blurring of roles." *Id.*

279.    Effective services are especially lacking for members of the ADA Subclass, who are put at increased risk of institutionalization when their needs are left unmet. For instance, Sara was shuffled from foster home to foster home and did not receive effective therapy or other forms of treatment to address the sexual abuse she has repeatedly suffered, and Desmond has been forced to live in an adult-nursing home instead of a foster home because of DCS's failure to provide in-home supports to accommodate his disability.

280.    Defendants' failure to provide necessary services to children and parents impedes reunification efforts, because children are either unable to return home, or they are returned home before the issues that led to their removal are adequately addressed.

281.    Defendants' failure to provide necessary services substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to Plaintiffs and the classes they represent.

**M.    Lack of Permanency.**

282.    Permanent homes and families are critical to ensuring a child's healthy development. Research shows that children suffer when they grow up in state custody without achieving permanency.

283.    But the length of time children in out-of-home placements in Indiana wait to achieve permanency has increased over the years.

284.    As of May 27, 2018, 5,897 Hoosier children's case plans included adoption as a goal. But only 143 children of those children were adopted in the six months between October 2017 and March 2018.

70

285.     Indiana's low adoption rate is partially a result of DCS's ineffective legal division. The legal division is staffed with attorneys who represent the agency in child welfare legal proceedings, including CHINS and termination of parental rights proceedings. But the DCS legal workforce suffers from a high turnover rate, persistent vacancies, and inexperienced employees. This results in "inconsistent availability of consistent and good quality legal consultation to case managers and…continuances of scheduled court hearings as well as delayed filing for termination of parental rights when reunification efforts have been unsuccessful." *Id.*

286.     Last summer, the Indiana Court of Appeals rebuked DCS regarding its handling of proceedings involving the termination of parental rights. On July 9, 2018, the Indiana Court of Appeals issued an Order noting a "disturbing trend" with nine cases it had received in the prior six months. *A.A. v. Ind. Dep't of Child Servs.*, 100 N.E.3d 708, 709 (Ind. Ct. App. 2018). In these cases, parents appealed the termination of their parental rights, and DCS moved for the cases to be remanded to the trial court, conceding DCS had violated the parents' due process rights. *Id.* The court wrote, "[t]he increasing frequency of these motions suggest that there are repeated, significant violations of due process occurring in termination of parental rights cases throughout this state." *Id.* The Court went so far as to "formally admonish DCS for its failure to afford litigants throughout this state the due process rights they are owed." *Id.*

287.     This serious mishandling of termination of parental rights matters harms not only parents but also children, who are left languishing in foster care as the legal proceedings are unnecessarily drawn out.

288.     Indiana's failure to provide children with permanent homes within a reasonable period of time is a direct result of Defendants' failure to bring and appropriately litigate termination of parental rights proceedings; failure to secure adoptive homes for children on paths to adoption;

and failure to remedy structural and systemic deficiencies that have negatively affected Indiana's foster care system for years.

289.     DCS's failure to ensure Plaintiff children are placed in permanent homes within a reasonable period of time substantially departs from professional judgment and demonstrates a deliberate indifference to the risk of harm to Plaintiff children and the classes they represent.

## CAUSES OF ACTON

## FIRST CAUSE OF ACTION

### Substantive Due Process under the U.S. Constitution
### (Asserted by the General Class Against Defendants)

290.     Each of the foregoing allegations is incorporated as if fully set forth herein.

291.     A state assumes an affirmative duty under the Fourteenth Amendment to the U.S. Constitution to provide reasonable care to, and to protect from harm, a child with whom it has formed a special relationship.

292.     The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all of the members of the General Class. Defendants are well aware of the policies and practices in place, which prevent these class members from receiving adequate protection from physical and psychological harm after the State has formed a special relationship with them. As a result, the named Plaintiffs and all of the members of the class of children to whom the state owes a special duty, children who have a special relationship with Defendants, including wards of DCS, have been, and are, at risk of being deprived of their substantive due process rights conferred upon them by the Fourteenth Amendment to the U.S. Constitution.

293.     These substantive due process rights include, but are not limited to:

a.      the right to investigations of maltreatment that conform with reasonable professional standards;

b.      the right to conditions and duration in foster care reasonably related to the purpose of government custody;

c.      the right to freedom from maltreatment, and repeated maltreatment, while under the protective supervision of the State;

d.      the right to protection from unnecessary intrusions into the child's emotional well-being once the State has established a special relationship with the child;

e.      the right to services necessary to prevent unreasonable risk of harm;

f.      the right to treatment and care consistent with the purpose and assumptions of government custody; and

g.      the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody.

## SECOND CAUSE OF ACTION

**First, Ninth and Fourteenth Amendments to the U.S. Constitution
(Asserted by the General Class Against Defendants)**

294.    Each of the foregoing allegations is incorporated as if fully set forth herein.

295.    Plaintiffs and the class members they represent are in Defendants' custody or guardianship and are wholly dependent on Defendants to provide for their basic physical, psychological, and emotional needs, and to protect them from physical, psychological, and emotional harm.

296.    Children frequently and foreseeably suffer physical, psychological, and emotional harm in DCS custody. They suffer harm in part because, in sharp contrast with the ideal of a stable and permanent home and family, they are continually shuttled between temporary and often non-familial custodial arrangements.  Professional judgment and standards of conduct require the Defendants to make reasonable efforts toward placing children in their care in stable, permanent homes and families.

297.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to the constitutional rights of Plaintiffs and the members of the General Class.

298.    By failing to take all reasonable efforts toward fostering familial association and securing a permanent home and family for the named Plaintiffs and the class members they represent, Defendants have failed to protect them from psychologically and emotionally harmful shuttling between temporary living arrangements.

299.    As a result, the named Plaintiffs and all of the members of the General Class have been, and are at risk of being, deprived of the right to familial association and reasonable protection from psychological and emotional harm while in Defendants' custody, in violation of the First Amendment's right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.

## THIRD CAUSE OF ACTION

**The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.***
**(Asserted by the General Class Against Defendants)**

300.    Each of the foregoing allegations is incorporated as if fully set forth herein.

301.     The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom of depriving the named Plaintiffs and the classes they represent of the rights contained in the Child Welfare Act of 1980, as amended by the Adoptive and Safe Families Act of 1997, to:

a.     a written case plan that includes a plan to provide safe, appropriate, and stable placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

b.     a written case plan that ensures that the child receives safe and proper case management while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16, 675(1)(B);

c.     a written case plan that ensures provision of services to parents, children, and foster parents to facilitate reunification, or where that is not possible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B); and

d.     a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, closest to their home community, 42 U.S.C. §§ 671(a)(16), 675(1)(A).

302.     These provisions of the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, are clearly intended to benefit Plaintiffs and the classes they represent; the rights conferred are neither vague nor amorphous such to strain judicial competence; and the statute imposes a binding obligation on the states. 42 U.S.C. § 1983; *see also Henry A. v. Willden*, 678 F.3d 991, 1008-09 (9th Cir. 2012).

## FOURTH CAUSE OF ACTION

### American with Disabilities Act and Rehabilitation Act
### (Asserted by the ADA Subclass Against Defendants)

303.     Each of the foregoing allegations is incorporated as if fully set forth herein.

304.     Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and its enabling regulations, 28 C.F.R. 35.101 et seq., prohibit discrimination against individuals with disabilities.

305.     ADA Subclass Plaintiffs have behavioral,  developmental and psychiatric disabilities, which qualify them as individuals with disabilities within the meaning of the ADA, 42 U.S.C. § 12132(2) and "otherwise qualified individuals with a disability" under the Rehabilitation Act, 29 U.S.C. § 794; 29 U.S.C. § 705(20). They meet the essential eligibility requirements for the receipt of foster care services provided by DCS.

306.     Defendants are public entities, or public officials of a public entity, subject to the provisions of the ADA, 42 U.S.C. § 12132(1)(A). Such entities also receive federal financial assistance and are thus subject to the requirements of the Rehabilitation Act. 29 U.S.C. § 794(b); 34 C.F.R. 104.51. Defendants Holcomb and Stigdon are sued in their official capacities as state officials responsible for administering and/or supervising Indiana programs and activities related to foster care services.

307.     Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in, or denying the benefits of, the goods, services, programs and activities of the entity or otherwise discriminating against a person on the basis of his or her disability.

308.     Likewise, the Rehabilitation Act and its enabling regulations prohibit discrimination in the provision of services by any entity receiving federal funding. 34 C.F.R. 104.4(b)(1)(ii), (b)(2); 34 C.F.R. 104.52(a)(2).

309.     Under the regulations enforcing the ADA, the state may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others . . . ." 28 C.F.R. § 35.130(b)(1)(iii).

310.     Accordingly, DCS must provide children with disabilities an equal opportunity to access foster care services, in the least restrictive appropriate setting, as it provides to children without disabilities in its custody.

311.     Moreover, Defendants have an affirmative duty to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

312.     As set forth above, the regulatory hallmark and guiding force of disability law is the provision of services, including the child's placement in the most integrated environment appropriate to the youth's needs. 28 C.F.R. § 35.130(d); 34 C.F.R. 104.4(b)(2); *see also Olmstead v. L.C.*, 527 U.S. 581, 602 (1999).

313.     As a direct and proximate result of Defendants' violations of Title II of the ADA and the Rehabilitation Act, Plaintiffs have been or are at risk of being placed in overly restrictive settings and subjected to unnecessary trauma because of their disabilities, as set forth above, and

will continue to suffer injury until Defendants are required to, and have, come into compliance with the requirements of the ADA and Rehabilitation Act.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court:

I.      Assert jurisdiction over this action;

II.     Order the Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

III.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

a.      Defendants' violation of Plaintiff Children's right to be free from harm under the Fourteenth Amendment to the U.S. Constitution;

b.      Defendants' violation of Plaintiff Children's rights under the First, Ninth and Fourteenth Amendments to the U.S. Constitution;

c.      Defendants' violation of Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 *et seq.*;

d.      Defendants' violation of Plaintiff Children's rights under Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794.; and,

IV.     Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights, including:

a.      Enjoin Defendants from failing to maintain caseloads for all workers providing direct supervision and planning for children at accepted

professional standards, as developed by either the COA and/or the CWLA, or a workload analysis conducted by DCS. Require that DCS periodically verify that it is meeting and maintaining the applicable caseload standards, and that its verification process and the results shall be public information;

b.      Enjoin Defendants from investigating, creating, and maintaining Informal Adjustments of children reported for maltreatment without thorough, adequate, and professionally acceptable investigations and provision of necessary services;

c.      Enjoin defendants from failing to conduct an emergency evaluation of all children who enter foster care within 72 hours to determine their immediate foster care needs, and from failing to conduct a full and comprehensive evaluation of their placement needs no later than 30 days after they enter foster care to ensure that the children are matched with the most appropriate placement;

d.      Enjoin defendants from separating siblings when they enter foster care together unless it is contrary to the best interests of any of the children to be placed together with his or her siblings;

e.      Enjoin defendants from failing to provide all necessary services to each child who enters foster care, including necessary services to the child's parents to ensure a speedy reunification for as long as the child's permanency plan remains reunification;

f.      Enjoin defendants from placing any child in a congregate care setting based on the unavailability of foster home resources;

g.      Enjoin defendants from failing to file and proceed with a timely petition to free a child for adoption when the child's permanency plan is adoption;

h.      Enjoin defendants from failing to take all necessary steps to seek and secure an appropriate adoptive placement for a child when the child's plan is adoption;

i.      Require that DCS conduct annual case record reviews of a statistically significant sample of children in DCS custody to measure the degree to which children in DCS custody are receiving timely permanence, as required by state and federal law, and the degree to which they are being maltreated in care; the degree to which placement stability is maintained for these children, and issue annual public reports on the findings of these case record reviews; and

j.      Appoint a neutral monitor to oversee compliance with the terms of this Court's order.

V.      Award Plaintiff Children the reasonable costs and expenses incurred to litigate this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h).

VI.      Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Children from further harm while in Defendant Stigdon's custody in foster care.

Dated: June 25, 2019

Respectfully submitted,

s/ *Melissa Keyes*
Melissa Keyes, No. 30152-49
Nikki Gray, No. 31209-49
Indiana Disability Rights
4701 North Keystone Avenue, Suite 222
Indianapolis, Indiana 46205
Tel.: (317) 722-5555
Fax: (317) 722-5564
mkeyes@indianadisabilityrights.org
ngray@indianadisabilityrights.org

Marica Lowry, *pro hac vice pending*
Anastasia Benedetto, *pro hac vice pending*
A Better Childhood
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel.: (646) 795-4456
Fax: (212) 692-0415
mlowry@abetterchildhood.org
abenedetto@abetterchildhood.org

Aaron Marks, *pro hac vice pending*
Carrie Bodner, *pro hac vice pending*
Kara Cheever, *pro hac vice pending*
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
Fax: (212) 446-4900
aaron.marks@kirkland.com
carrie.bodner@kirkland.com
kara.cheever@kirkland.com

Kristen Bokhan, *pro hac vice pending*
Kirkland & Ellis, LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Tel.: (202) 389-5000
Fax: (202) 389-5200
kristen.bokhan@kirkland.com